Nos. 20-1062 (L), 20-1063, 20-1358, 20-1359

# In the United States Court of Appeals for the Fourth Circuit

---

**GEORGE HENGLE; SHERRY BLACKBURN; WILLIE ROSE; ELWOOD BUMBRAY; TIFFANI MYERS; STEVEN PIKE; SUE COLLINS; LAWRENCE MWETHUKU,** ON BEHALF OF THEMSELVES AND ALL INDIVIDUALS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

*v.*

**SHERRY TREPPA,** CHAIRPERSON OF THE HABEMATOLEL POMO OF UPPER LAKE EXECUTIVE COUNCIL; **TRACEY TREPPA,** VICE-CHAIRPERSON OF THE HABEMATOLEL POMO OF UPPER LAKE EXECUTIVE COUNCIL; **KATHLEEN TREPPA,** TREASURER OF THE HABEMATOLEL POMO OF UPPER LAKE EXECUTIVE COUNCIL; **IRIS PICTON,** SECRETARY OF THE HABEMATOLEL POMO OF UPPER LAKE EXECUTIVE COUNCIL; **SAM ICAY, AIMEE JACKSON-PENN,** AND **AMBER JACKSON,** MEMBERS-AT-LARGE OF THE HABEMATOLEL POMO OF UPPER LAKE EXECUTIVE COUNCIL; IN THEIR OFFICIAL CAPACITIES; **SCOTT ASNER;** AND **JOSHUA LANDY,**

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NO. 3:19-CV-00250 (NOVAK, D.)

---

## BRIEF OF APPELLANTS

---

MATTHEW E. PRICE
JENNER & BLOCK LLP
1099 New York Ave NW, Suite 900
Washington, DC 20001
202-639-6873
mprice@jenner.com

*Counsel for Scott Asner and Joshua Landy*

RAKESH N. KILARU
WILKINSON WALSH LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
202-847-4000
rkilaru@wilkinsonwalsh.com

*Counsel for Tribal Appellants*

*Additional Counsel Included on Signature Page*

# CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants Sherry Treppa, Chairperson of the Habematolel Pomo of Upper Lake Executive Council; Tracey Treppa, Vice-Chairperson of the Habematolel Pomo of Upper Lake Executive Council; Kathleen Treppa, Treasurer of the Habematolel Pomo of Upper Lake Executive Council; Iris Picton, Secretary of the Habematolel Pomo of Upper Lake Executive Council; and Sam Icay, Aimee Jackson-Penn, and Amber Jackson, Members-At-Large of the Habematolel Pomo of Upper Lake Executive Council; in their official capacities, constitute the governing body of the Habematolel Pomo of Upper Lake, a federally recognized tribe. As such, they are not a publicly held corporation, have no corporate parents, and do not issue stock.

Defendant-Appellant Scott Asner is an individual and as such has no corporate parent and does not issue stock.

Defendant-Appellant Joshua Landy is an individual and as such has no corporate parent and does not issue stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................i

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ...........................................................4

ISSUES PRESENTED ............................................................................5

STATEMENT OF THE CASE ..................................................................6

I.    Factual Background. ........................................................................6

    A.    The Parties. ...........................................................................6

    B.    Tribal Consumer Protection Law. ...........................................9

    C.    Plaintiffs' Loan Agreements. ................................................10

II.    Procedural History .........................................................................13

    A.    The Original Complaint. .......................................................13

    B.    Appellants' Motions To Compel And Dismiss. .......................14

    C.    The Amended Complaint. .....................................................16

    D.    The District Court's Order. ....................................................17

    E.    This Appeal. ........................................................................20

STANDARD OF REVIEW .......................................................................21

SUMMARY OF ARGUMENT ...................................................................21

ARGUMENT ..........................................................................................24

I.    The District Court Should Have Enforced The Parties'
Agreement To Arbitrate. ................................................................24

    A.    The District Court Should Have Honored The Parties'
Choice To Have An Arbitrator Resolve Challenges
To The Arbitration Agreement. .............................................25

        1.  There Is A Strong Federal Policy Favoring
Enforcement Of Delegation Clauses. ..........................25

        2.  The Parties Expressly And Validly Delegated
Arbitrability Challenges To The Arbitrator. ................27

B. The District Court Erred By Invalidating The Arbitration Agreements Under The Prospective Waiver Doctrine. ..................................................32

    1. Courts Cannot Entertain Prospective Waiver Challenges Prior To Arbitration. ...............................32

    2. The Agreements Do Not Unambiguously Renounce Applicable Federal Law. ...........................35

C. The District Court Erred In Refusing To Sever Any Offending Provisions From The Arbitration Agreements. ..................................................39

II. The District Court Should Have Enforced The Parties' Agreement To Apply Tribal Law To Their Loans. ..................................................42

A. Virginia Has A Strong Public Policy Of Enforcing Parties' Choice Of Law. ..................................................44

B. The Virginia Supreme Court's *Settlement Funding* Decision Requires Enforcement Of The Choice-of-Law Provision. ..................................................46

C. Nothing Else In Virginia Law Justifies Invalidating The Choice-Of-Law Provision. ..................................................50

D. Tribal Law Provides Ample Consumer Protections. ..................................................56

III. Sovereign Immunity Bars Plaintiffs' State-Law Claims Against The Tribe's Government. ..................................................59

A. Neither Congress Nor The Constitution Permits Plaintiffs' State-Law Claims. ..................................................60

B. *Bay Mills* Did Not Create A New Cause Of Action For State-Law Claims Against Tribal Officials ..................................................64

C. At Minimum, *Bay Mills* Did Not Permit Plaintiffs' Claims. ..................................................69

CONCLUSION ..................................................74

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aggarao v. MOL Ship Mgmt. Co.*,
  675 F.3d 355 (4th Cir. 2012) ..............................................32, 33, 38, 39

*Albemarle Corp. v. AstraZeneca UK Ltd.*,
  628 F.3d 643 (4th Cir. 2010) ..............................................................45

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ............................................................................71

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ............................................................................32

*Antrican v. Odom*,
  290 F.3d 178 (4th Cir. 2002) ..............................................................61

*Asignacion v. Rickmers Genoa*,
  783 F.3d 1010 (5th Cir. 2015) ............................................................33

*Big Four Mills, Ltd. v. Commercial Credit Co.*,
  211 S.W.2d 831 (Ky. 1948) ................................................................55

*Blake Constr. Co./Poole & Kent v. Upper Occoquan Sewage Auth.*,
  587 S.E.2d 711 (Va. 2003) ................................................................51

*Bogan v. Scott-Harris*,
  523 U.S. 44 (1998) ..............................................................................60

*Booker v. Robert Half Int'l, Inc.*,
  413 F.3d 77 (D.C. Cir. 2005) ..............................................................40

*Bowles v. Russell*,
  551 U.S. 205 (2007) ............................................................................69

*C & L Enters., Inc. v. Citizen Band Potawatomi Tribe of Okla.*,
  532 U.S. 411 (2001) ............................................................................60

*California v. Cabazon Band of Mission Indians*,
  480 U.S. 202 (1987) ......................................................................58, 72

Page(s)

**Cases—continued:**

*Chesapeake Supply & Equip. Co. v. J.I. Case Co.,*
700 F. Supp. 1415 (E.D. Va. 1988) ................................................. 58

*Colgan Air, Inc. v. Raytheon Aircraft Co.,*
507 F.3d 270 (4th Cir. 2007) ........................................................ 45

*Commonwealth v. NC Fin. Sols of Utah, LLC,*
2018 WL 9372461 (Va. Cir. 2018) ............................................... 50

*Commonwealth, State Lottery Dep't v. Settlement Funding, LLC,*
2006 WL 727873 (Va. Cir. 2006) ........................................... 47, 49

*Commonwealth, State Lottery Dep't v. Settlement Funding, LLC,*
2008 WL 6759945 (Va. Cir. 2008) ......................................... 49, 50

*Consumers Distrib. Co. v. Hermann,*
812 P.2d 1274 (Nev. 1991) ........................................................... 57

*Dillon v. BMO Harris Bank, N.A.,*
856 F.3d 330 (4th Cir. 2017) ................................................ *passim*

*Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji,*
32 F.3d 77 (4th Cir. 1994) ............................................................. 4

*EMA Fin., LLC v. NFusz, Inc.,*
2020 WL 1272189 (S.D.N.Y. 2020) ............................................. 57

*Ex parte Young,*
209 U.S. 123 (1908) ....................................................... 61, 62, 67, 68

*Exch. Bank & Tr. Co. v. Tamerius,*
265 N.W.2d 847 (Neb. 1978) ........................................................ 55

*Franchise Tax Bd. of Ca. v. Hyatt,*
139 S. Ct. 1485 (2019) .................................................................. 70

*Gannon v. Circuit City Stores, Inc.,*
262 F.3d 677 (8th Cir. 2001) ........................................................ 40

Page(s)

**Cases—continued:**

*General Motors Corp. v. Tracy,*
   519 U.S. 278 (1997)................................................................65

*Gingras v. Think Finance, Inc.,*
   922 F.3d 112 (2d Cir. 2019)...........................................64, 71, 72

*Hadnot v. Bay, Ltd.,*
   344 F.3d 474 (5th Cir. 2003) ..................................................40

*Hayes v. Delbert Servs. Corp.,*
   811 F.3d 666 (4th Cir. 2016) .........................................*passim*

*Henry Schein v. Archer & White Sales, Inc.,*
   139 S. Ct. 524 (2019).................................................24, 25, 27, 34

*Hernandez v. Mesa,*
   140 S. Ct. 735 (2020)..............................................................64

*Heubusch & Reynolds v. Boone,*
   192 S.E.2d 783 (1972).............................................................48

*Hitachi Credit Am. Corp. v. Signet Bank,*
   166 F.3d 614 (4th Cir. 1999) ..................................................45

*Home Depot U.S.A., Inc. v. Jackson,*
   139 S. Ct. 1743 (2019)............................................................64

*In re Cotton Yarn Antitrust Litig.,*
   505 F.3d 274 (4th Cir. 2007) ..................................................40

*In re Merritt Dredging Co.,*
   839 F.2d 203 (4th Cir. 1988) ..................................................44

*In re Rent-Rite Superkegs W., Ltd.,*
   603 B.R. 41 (Bankr. D. Colo. 2019)........................................55

*JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.,*
   2017 WL 4003026 (E.D. Va. Sept. 11, 2017)..........................45

Page(s)

**Cases—continued:**

*Jim's Motorcycle, Inc. v. Smit,*
    546 U.S. 936 (2005) ................................................................65

*Kiowa Tribe of Okla. v. Mfg. Tech., Inc.,*
    523 U.S. 751 (1998) ................................................................69

*Kokkonen v. Guardian Life Ins. Co.,*
    511 U. S. 375 (1994) ..............................................................64

*L'Arbalete, Inc. v. Zaczac,*
    474 F. Supp. 2d 1314 (S.D. Fla. 2007) ................................55

*Lewis v. Clarke,*
    137 S. Ct. 1285 (2017) ...............................................63, 68, 69

*Massachusetts v. E.P.A.,*
    549 U.S. 497 (2007) ...............................................................70

*Mastrobuono v. Shearson Lehman Hutton, Inc.,*
    514 U.S. 52 (1995) .................................................................36

*Metro. Stevedore Co. v. Rambo,*
    515 U.S. 291 (1995) ...............................................................66

*Michigan v. Bay Mills Indian Cmty.,*
    572 U.S. 782 (2014) ......................................................*passim*

*Minnieland Private Day Sch., Inc. v. Applied Underwriters*
    *Captive Risk Assurance Co., Inc.,*
    867 F.3d 449 (4th Cir. 2017) ...........................................21, 28

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
    473 U.S. 614 (1985) ...............................................................33

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ...................................................................25

Page(s)

**Cases—continued:**

*Novic v. Credit One Bank, Nat'l Ass'n*,
    757 F. App'x 263 (4th Cir. 2019) ......................................26

*Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*,
    397 S.E. 2d 804 (Va. 1990) ...........................................45

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ..................................19, 61, 62, 63

*Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*,
    867 F.2d 809 (4th Cir. 1989) ........................................24

*Porter Hayden Co. v. Cent. Indem. Co.*,
    136 F.3d 380 (4th Cir. 1998) ................................*passim*

*Preston v. Ferrer*,
    552 U.S. 346 (2008) ...................................................24

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010) ...............................................25, 28

*Roe v. Doe*,
    28 F.3d 404 (4th Cir. 1994) ..........................................21

*Runs After v. United States*,
    766 F.2d 347 (8th Cir. 1985) ........................................60

*Santa Clara Pueblo v. Martinez*,
    436 U.S. 49 (1978) ...........................................59, 66, 68

*Saturn Capital Corp. v. Dorsey*,
    2006 WL 1767602 (Tex. App. June 29, 2006) ...............55

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506 (1974) .................................................45

Page(s)

**Cases—continued:**

*Schoemann v. eWellness Healthcare Corp.*,
  2017 WL 4701317 (M.D. La. Oct. 19, 2017) ....................................55

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ..........................................................................67

*Settlement Funding, LLC v. Van Neumann-Lillie*,
  645 S.E.2d 436 (Va. 2007) ......................................................*passim*

*Sheer Asset Mgmt. Partners v. Lauro Thin Films, Inc.*,
  731 A.2d 708 (R.I. 1999) .................................................................55

*Smith v. Anderson*,
  801 F.2d 661 (4th Cir. 1986) ....................................................52, 54

*Spinetti v. Serv. Corp., Int'l*,
  324 F.3d 212 (3d Cir. 2003) .............................................................40

*Tate v. Hain*,
  25 S.E.2d 321 (Va. 1943) .........................................................*passim*

*Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*,
  498 U.S. 505 (1991) ..........................................................................59

*Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*,
  432 F.3d 1327 (11th Cir. 2005) .......................................................40

*Torres v. SOH Dist. Co., Inc.*,
  2010 WL 1959248 (E.D. Va. 2010) ...................................................41

*Union Cent. Life Ins. Co. v. Pollard*,
  94 Va. 146 (1896) .............................................................................44

*United States v. Pasquantino*,
  336 F.3d 321 (4th Cir. 2003) ...........................................................65

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ..........................................................................61

Page(s)

**Cases—continued:**

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,*
515 U.S. 528 (1995) ..................................................................32, 33

*Watkins v. M/V London Senator,*
112 F. Supp. 2d 511 (E.D. Va. 2000), 112 F. Supp. 2d ....................46

*Willard v. Aetna Cas. & Sur. Co.,*
193 S.E.2d 776 (Va. 1973) ....................................................................46

*Williams v. Big Picture Loans, LLC,*
929 F.3d 170 (4th Cir. 2019) ....................................................*passim*

*Worcester Cty. Tr. Co. v. Riley,*
302 U.S. 292 (1937) ................................................................................60

*Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc.,*
401 F.3d 560 (4th Cir. 2005) ..........................................................64, 65

*Zaklit v. Glob. Linguist Sols., LLC,*
53 F. Supp. 3d 835 (E.D. Va. 2014) ....................................................41

*Zaklit v. Glob. Linguist Sols., LLC,*
2014 WL 3109804 (E.D. Va. July 8, 2014) ........................................44

**Constitutional Provisions**

U.S. Const. Am. XI ..................................................................................70

U.S. Const. art. III, § 1 ..........................................................................70

U.S. Const. art. III, § 2, cl. 2 ................................................................63

**Federal Statutes**

9 U.S.C. § 2 ..............................................................................................24

9 U.S.C. § 10 ............................................................................................32

9 U.S.C. § 16(a) ........................................................................................4

Page(s)

**Federal Statutes—continued:**

12 U.S.C. § 5481(27) ..................................................................63

18 U.S.C. § 1964 .......................................................................20

18 U.S.C. § 1965 .........................................................................3

25 U.S.C. § 3601(1) ...................................................................58

25 U.S.C. § 4301 .......................................................................74

25 U.S.C. § 4301(b)(6) ................................................................7

28 U.S.C. § 1292(b) .....................................................................4

28 U.S.C. § 1332(d)(2) .................................................................3

28 U.S.C. § 1367 ..........................................................................3

**State Statutes**

Va. Code § 6.2-303(B) ...............................................................52

Va. Code § 6.2-306(A) ...............................................................51

Va. Code §§ 6.2-309–329 ...........................................................52

Va. Code § 6.2-316 ....................................................................52

Va. Code § 6.2-1541 ..................................................................53

**Rules**

Federal Rule of Appellate Procedure 27(d)(2)(A) .....................77

**Other Authorities**

Federal Deposit Insurance Corporation,
  RMS Manual of Examination Policies,
  § 3.2-81–3.2-82 (2019) ..............................................................8

Page(s)

**Other Authorities—continued:**

Consumer Finance Frequently Asked Questions,
    Idaho Dep't of Finance ................................................................57, 58

Hearing on Tribal Programs: Before the H. Sub. Comm.
    on Interior, Environment & Related Agencies,
    116th Cong. (Feb. 12, 2020) ...............................................................58

H. Comm. on Labor & Commerce Meeting,
    2018 Va. Leg. Sess. (Feb. 8, 2018) ....................................................54

Mem. of Understanding, Commerce In The Electronic Age
    (Dec. 23, 2019)......................................................................................71

Restatement (Second) of Contracts § 207 (1981) ..............................73

State Corporation Commission,
    2018 Fiscal Impact Statement HB1248 ..........................................54

# INTRODUCTION

In 2012, the Habematolel Pomo of Upper Lake Tribe ("Tribe") chartered a tribally controlled online lending business with the hope of minimizing—if not eliminating—its dependence on federal aid. In less than a decade, the Tribe has established a lending operation capable of servicing loans from application through collection. All the revenues generated by the Tribal businesses remain within the Tribe's control, and the Tribe has used them to fund government programs and services for its members and fuel the Tribe's economy. As this Court recognized last year, such success in "becom[ing] self-sufficient, and develop[ing] economic opportunities for [tribal] members," is exactly what federal Indian law seeks to promote. *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 179 (4th Cir. 2019).

This case involves the same attorneys, one of the same Plaintiffs, and similar factual allegations as *Williams*, but the central question is both more straightforward and more fundamental: Can a court disregard binding precedent on arbitration, contract interpretation, and sovereign immunity because a case involves a tribe? The answer, as the Supreme Court has held time and again, is no—tribes are entitled to equal treatment under the law. The district court's decisions on each of those three grounds warrant reversal.

*First*, the district court ignored clear guidance from the Supreme Court and this Court in denying Appellants' motions to submit Plaintiffs' claims to arbitration. It is undisputed that the parties agreed to arbitrate all disputes and delegate to the arbitrator any challenges to their arbitration agreements. The strong federal policy favoring arbitration requires honoring such agreements and resolving any ambiguities in favor of arbitration—regardless who the parties may be. The district court turned these principles upside down in nullifying the parties' agreement based on a misguided construction of contractual language intended to make arbitration *more accessible* to borrowers.

*Second*, the district court contravened controlling Virginia Supreme Court precedent in declining to enforce the parties' express agreement to apply Tribal law to their loans. The choice-of-law provision should have compelled dismissal of Plaintiffs' claims, which all depend on applying substantive Virginia law. Instead, the district court invalidated the choice-of-law provision as against Virginia public policy because Tribal law does not limit interest rates. But the Virginia Supreme Court has expressly held that it does *not* violate the Commonwealth's public policy to enforce a contractual provision selecting another sovereign's law (in that case, Utah's), even when

that law does not contain an interest rate limit. There was no basis for disregarding this on-point precedent, which required honoring the parties' contractual choice.

*Third*, the district court disregarded decades of Supreme Court precedent by allowing Plaintiffs to attempt to enjoin the Tribe's government from alleged violations of state law. Congress alone has the authority to abrogate tribal sovereign immunity, and Congress has not taken that step here. Nor is there any basis for allowing Plaintiffs to seek an injunction against the Tribe's government through what the district court termed an "*Ex parte Young*-style" lawsuit. The limited exception to sovereign immunity announced in *Young* exists to vindicate the supremacy of *federal* law. As the Supreme Court has held, the rule and rationale of *Young* have no force in suits to enforce *state* law.

Collectively, the district court's rulings deprive tribes and tribal businesses of equal access to tools that non-tribal businesses throughout this country use every day, and immunities that allow other governments to function effectively. Those rulings cannot stand.

## JURISDICTIONAL STATEMENT

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1332(d)(2) and 1367 and 18 U.S.C. § 1965. JA1470.

This Court has appellate jurisdiction over the denial of Appellants' motions to compel arbitration under 9 U.S.C. § 16(a), the choice-of-law ruling under 28 U.S.C. § 1292(b), and the sovereign immunity ruling under the collateral order doctrine, *see Eckert Int'l, Inc. v. Gov't of the Sovereign Democratic Republic of Fiji*, 32 F.3d 77, 79 (4th Cir. 1994).

The Order on appeal was entered on January 9, 2020. JA1812–13. Appellants timely filed their notices of appeal as to the arbitration and sovereign immunity issues on January 16, 2020, and January 21, 2020. JA1814–17; JA1825–27. Appellants timely and successfully petitioned to certify the choice-of-law issue for appeal under 28 U.S.C. § 1292(b). JA1851; *Asner v. Hengle*, No. 20-161 (4th Cir.), Order, Dkt. No. 13; *Treppa v. Hengle*, No. 20-164 (4th Cir.), Order, Dkt. No. 18.

As below, by appearing in this Court, the Tribe's officials do not individually or collectively waive any defense, including sovereign immunity, which bars jurisdiction over them, *see infra* at 59–74. Similarly, Appellants Asner and Landy moved to dismiss on personal jurisdiction grounds below,

and they do not waive those arguments (which are not at issue in this appeal) by appearing.

## ISSUES PRESENTED

1. Whether the parties' agreements to arbitrate should have been enforced. This issue involves three separate, dispositive questions:

    a. Whether the district court should have enforced the parties' agreements to delegate to the arbitrator any challenges to the arbitration agreements.

    b. Whether the arbitration agreements permit Plaintiffs to raise federal claims they could pursue in federal court.

    c. Whether the district court should have implemented the parties' agreements to sever any contractual language that would preclude arbitration.

2. Whether enforcement of the loan agreements' choice-of-law provision, which specifies that Tribal law applies, violates Virginia public policy.

3. Whether private plaintiffs can sue sovereign government officials in their official capacities for alleged violations of state law in an "*Ex parte Young*-style" lawsuit.

# STATEMENT OF THE CASE

## I.    FACTUAL BACKGROUND.

### A.    The Parties.

<u>The Tribe's Executive Council.</u> Sherry Treppa, Tracey Treppa, Kathleen Treppa, Iris Picton, Sam Icay, Aimee Jackson-Penn, and Amber Jackson ("Tribal Appellants") constitute the Tribe's Executive Council. The Tribe's Constitution vests the Executive Council with the power to enact and administer the Tribe's laws. JA81–82.

Decades of tragic interactions with the federal government left the Tribe landless and without a traditional tax base. The Tribe is indigenous to California's Clear Lake Basin—a rural area several hours north of San Francisco. Beginning in 1878, the Tribe's ancestors purchased land (eventually growing to 564 acres), formalized government-to-government relations with the United States, and enacted a Constitution. JA80. But in the 1950s, the federal government took the extraordinary steps of terminating the Tribe's federal recognition and aid, revoking its Constitution, and redistributing its lands. JA72; JA80–81. The Tribe successfully fought this unlawful termination in federal court, but was unable to recover its lands. JA81. Since then, the Tribe has restored only 11.24 acres of land for its reservation. JA83.

This case arises from the Tribe's success in using e-commerce to create a self-sustaining economy and end its dependence on the federal government. Federal law "promote[s] economic self-sufficiency and political self-determination for Indian tribes and members of Indian tribes," 25 U.S.C. § 4301(b)(6), and "encourag[es] the formation of new businesses . . . and the provision of services by Indians," *id.* § 4301(b)(1). The most common tribal economic development business—gaming—proved unsuccessful for the Tribe given its remote location. JA83–85; JA144. The Tribe accordingly turned to the internet, which allows customers to enter Tribal jurisdiction virtually. JA85. The Tribe established the foundation of its online lending business in 2012. JA73–74; JA88–89. Today, it owns and operates four loan portfolios and three Tribal corporations that provide shared services, such as call center, information technology, and human resources support. JA102–17.

Tribal Appellants, as members of the Executive Council, serve as the Directors of all Tribal corporate entities to oversee operations. JA118–22. The Tribe's four lending portfolios issue unsecured small-dollar loans repaid over time in multiple installments. Contracts are structured on a ten-month

schedule of payments consisting of both principal and fees or interest, with no prepayment penalties.[1] JA125–26.

Individual Defendants.  Scott Asner and Joshua Landy ("Individual Appellants") are non-Tribal members who were associated with or indirectly owned, in part, certain companies that initially provided services to the Tribe or purchased participation interests in early loans issued by the Tribal lending portfolios.  As explained below, neither Individual Appellants nor those companies exercised control over any aspect of the Tribe's operations, worked for the Tribal lending entities, or issued a loan to or collected any loan payment from any Plaintiff.  Individual Appellants' companies were sold to the Tribe nearly six years ago, in August 2014—before all but one of the named Plaintiffs' loans were even issued.  JA107–15.

Plaintiffs.  Plaintiffs are Virginia residents who entered into at least one loan agreement with at least one of the Tribe's lending portfolios at some point after 2012.  One of the Plaintiffs, George Hengle, was also a plaintiff in

---

[1] These features distinguish the Tribe's loan offerings from "payday" loans.  Payday loans are tied to a borrower's next paycheck and thus are offered on a very short timetable, generally as little as two weeks.  When the borrower's paycheck (or other income payment, such as a Social Security check) arrives, she must immediately pay back the principal plus a lending fee in a lump sum.  *See* Federal Deposit Insurance Corporation, RMS Manual of Examination Policies, §§ 3.2-81–3.2-82 (2019), https://perma.cc/5328-4YN4.

*Williams*, 929 F.3d 170, in which this Court rejected his claims against another tribe's lending businesses.

## B.     Tribal Consumer Protection Law.

Before issuing a single loan, the Tribe enacted the Consumer Financial Services Regulatory Ordinance to govern its businesses and provide comprehensive protections to consumers.    The Ordinance expressly incorporates the substantive standards of numerous federal consumer protection statutes, including the Dodd-Frank Act, the Truth in Lending Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, and Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive acts.    JA87; JA139–40; JA267–68 (relevant section of the Tribal Consumer Financial Services Regulatory Ordinance, as amended Dec. 2015).  With these protections in place, the Tribe made the sovereign policy choice not to set an interest rate cap for loans.

The Ordinance established a Consumer Financial Services Regulatory Commission to ensure Tribal businesses comply with the law.  JA87–88.  All Tribal lending entities must obtain a license from the Commission, maintain a legal compliance management system, and undergo at-least-annual Commission audits.  *Id.*  The Commission has enforcement authority to

address any legal violations. *Id.* It is led by a Tribal member with extensive knowledge of Tribal governance and business operations, who draws technical expertise from a former U.S. Attorney and a former acting deputy enforcement director for the Consumer Financial Protection Bureau. JA88.

### C.    Plaintiffs' Loan Agreements.

Before receiving loans, Plaintiffs completed an online application in which they certified they read and accepted the loan terms and conditions. JA127–33. Five out of eight Plaintiffs took out multiple loans, and so went through this process multiple different times. JA130–33. Several aspects of their agreements are essential here.

*First*, the agreements make clear that the lending businesses are Tribally owned and operated and entitled to sovereign immunity. The first paragraph of the loan terms defines "'Company,' 'We,' 'Our' and 'Us'" as "an arm of the Habematolel Pomo of Upper Lake Tribe of Indians that is a federally recognized Native American Tribe." JA1180.[2] The next paragraph highlights that loans must be repaid to an arm of the Tribe. JA1180–81. The

---

[2] The terms of Plaintiffs' loan agreements are largely identical. For ease of reference, citations to loan agreement provisions will refer to the September 2016 agreement of Tiffani Myers, which was used as a representative example by the parties and court below.

agreements later explain that both the Tribe and its businesses are entitled to "sovereign immunity," which means "you will be limited as to what claims, if any, you may be able to assert against the Tribe and Us." JA1184.

*Second*, the agreements highlight where they are "made and accepted": Not in Virginia, but "in the sovereign territory of the Habematolel Pomo of Upper Lake." JA1186.

*Third*, the agreements make clear that all disputes are to be resolved through arbitration.[3] Each is titled "CONSUMER LOAN AND ARBITRATION AGREEMENT." JA1180. The agreements explain arbitration at length and set forth a comprehensive list of potential claims to be resolved by arbitration, including "all claims, disputes, or controversies arising from or relating directly or indirectly to the signing of this Arbitration Provision, the validity and scope of this Arbitration Provision and any claim or attempt to set aside this Arbitration Provision," as well as "all tribal, federal or state law claims, disputes or controversies" and "all claims based upon a

---

[3] The full text of the arbitration provision is provided at JA1184–85.

violation of any tribal, state or federal constitution, statute or regulation." JA1184.[4]

The agreements ensure that arbitration is fair and accessible. The borrower is entitled to select one of the two most prominent national arbitration organizations (AAA or JAMS) to conduct the arbitration, and the "rules and procedures used by the applicable arbitration organization applicable to consumer disputes" will govern the dispute in tandem with the laws of the Tribe. JA1184–85. The Tribal lending entities advance the borrower's portion of the arbitration expenses and agree not to recoup them in the event the borrower is successful. JA1185. The agreements also provide that the borrower may request that the arbitration take place within 30 miles of her residence or another mutually agreed-upon location. *Id.* The decision of the arbitrator is "final and binding," JA1184, and the Tribal lending entities and related third parties may not obtain substantive review of the arbitration award in Tribal court.

---

[4] Plaintiff Lawrence Mwethuku opted out of arbitration through a provision in his contract allowing him to do so. JA1741. In a ruling not on appeal, the district court refused to submit Mwethuku's claims to the Tribal dispute resolution process to which he agreed. JA1741–47.

*Fourth*, like countless consumer contracts signed each day, the agreements contain a choice-of-law provision, selecting Tribal law rather than any state's law:

> This Agreement is made and accepted in the sovereign territory of the Habematolel Pomo of Upper Lake, and shall be governed by applicable tribal law, including but not limited to the Habematolel Tribal Consumer Financial Services Regulatory Ordinance. You hereby agree that this governing law provision applies no matter where You reside at the time You request Your loan from Mountain Summit Financial, Inc. Mountain Summit Financial, Inc. is regulated by the Habematolel Pomo of Upper Lake Tribal Consumer Financial Services Regulatory Commission. You may contact the Commission by mail at P.O. Box 516 Upper Lake CA 95485.

JA1186.

The loan agreements do not displace federal law. The agreements make clear that "any arbitration shall be governed by the FAA," defined earlier in the agreement as the Federal Arbitration Act. JA1185. And they specify that the "transaction involve[s] both interstate commerce and Indian commerce under the United States Constitution and other federal and tribal laws." *Id.*

## II.    PROCEDURAL HISTORY

### A.    The Original Complaint.

In April 2019, Plaintiffs filed a lawsuit against the Tribal lending businesses and Individual Appellants. Many of the allegations in the complaint related to other tribes' lending operations. *See, e.g.*, JA39–41; JA45–48. The

complaint otherwise contained conclusory allegations that the Tribe does not control its businesses, and that "non-tribal outsiders continue to receive the vast majority of the revenue pertaining to the enterprise." JA49–50. Plaintiffs sought treble damages and broad injunctive relief under RICO and Virginia law.

## B.     Appellants' Motions To Compel And Dismiss.

Appellants separately filed motions to compel arbitration and to dismiss the complaint on several grounds.

As relevant here, the Tribal businesses sought dismissal under Rule 12(b)(1) because they are arms of the Tribe that share its sovereign immunity. In support, the Tribal businesses submitted an 87-page affidavit from the Tribe's Chairperson, Sherry Treppa, describing their history and current operations. The affidavit established that:

- The Tribal businesses were created and incorporated under Tribal law, and have always been controlled by Boards of Directors consisting solely of the Tribe's Executive Council, JA73; JA88–92; JA118–24;

- The Tribe primarily obtained startup capital by offering to third parties participation interests—a mechanism commonly used in the banking industry to spread the risk of loans without forfeiting ownership or control, JA74; JA92–95;

- The Tribe terminated its participation agreements early in favor of fixed debt obligations, and then paid those off mostly ahead of schedule, JA75; JA107–15;

- The Tribe currently operates its businesses with no outside financial participation in its loans or debt, JA75; JA112; JA114–15; JA117;

- The combination of the Tribe's consumer financial services law and robust regulation have resulted in a positive customer experience, with a complaint rate of below 1% across all portfolios in 2018, JA76; JA126–27;

- The Tribe controls 100% of the revenues from the lending operation, and the Tribe has used those revenues to provide essential benefits and social services to its members, while also serving as a source of employment and support for members of the Tribe and the surrounding community, JA78; JA143–53;

- The Tribe endeavors to operate its business transparently, routinely informing state and federal government officials about its business operations in furtherance of positive government-to-government relations, JA76–77; JA140–42;

- Those efforts have been successful, resulting in, among other things, a disclaimer from the Virginia Bureau of Financial Institutions of any enforcement authority over the Tribal businesses, and a memorandum of understanding with New Mexico that acknowledges the Tribal businesses' right to offer loans over the internet, JA76–77; JA141–42.

The affidavit attached 111 exhibits, including all participation agreements, JA354–75; JA908–46; asset acquisition agreements, JA624–52; JA675–88; and merger documents and promissory notes tied to the termination of the participation agreements, JA746–965; as well as charts summarizing the yearly revenues the business has provided to the Tribe, JA1343–464.

## C.    The Amended Complaint.

Twelve days later, this Court issued its decision in *Williams*, 929 F.3d 170, finding that another tribe's lending businesses were immune, as arms of the tribe, from identical claims.  Rather than seeking discovery or challenging any of the factual assertions in Chairperson Treppa's affidavit, Plaintiffs amended their complaint to drop all claims against the Tribal businesses.  In their place, Plaintiffs raised new claims for injunctive relief under Virginia law and RICO against the Tribe's Executive Council.  In all other material respects, the complaint was unchanged.

Appellants again separately moved to compel arbitration and to dismiss the complaint.  As relevant here, Appellants moved to dismiss on the ground that the loan agreements' choice-of-law provision compelled the application of Tribal law.  *Hengle v. Asner*, No. 3:19-cv-250 (E.D. Va.), ECF No. 60, at 14–15; ECF No. 65, at 5–11.  It is undisputed that Plaintiffs' claims all depend on the application of Virginia law, so enforcement of the choice-of-law provision would require dismissal of the complaint.  Tribal Appellants also sought dismissal of all claims based on sovereign immunity, and Plaintiffs' RICO claims on the ground that RICO does not permit private plaintiffs to seek injunctive relief.  *Id.*, ECF No. 65, at 11–25.

### D.    The District Court's Order.

The district court denied Appellants' motions to compel arbitration, denied in part Tribal Appellants' motion to dismiss, and denied Individual Appellants' motion to dismiss.  JA1704–811.  The relevant portions of those opinions are summarized below.

Motions to Compel Arbitration.  The court first considered the loan agreements' "delegation clause," which specified that an arbitrator should resolve challenges to the requirement to arbitrate.  *See supra* at 11–12.  The court found that the agreements "clearly and unmistakably delegate[] arbitrability issues to an arbitrator."  JA1724.  The court also acknowledged that where there is a "clear[] and unmistakabl[e]" delegation provision, a court "may not decide the merits of any arbitrability issues and must submit such questions to the arbitrator."  JA1718.

The court nevertheless held the delegation clause unenforceable, on the ground that the loan agreements disavowed the FAA and thus barred the arbitrator from considering "any federal or state law defenses to arbitration provided under the FAA."  JA1732.  The court reached that holding notwithstanding the agreements' statement that "any arbitration shall be governed by the FAA."  *Id.*  The court held that this express language was

overridden by language in another provision allowing borrowers to request an arbitration within 30 miles of their residence, which merely stated that the borrowers' choice of location would not displace the parties' choice of law. JA1731. The court then concluded that the language it identified as problematic could not be severed from the remainder of the agreement. JA1735.

Having invalidated the delegation clause, the court then found the arbitration agreements unenforceable because it read them as precluding Plaintiffs from pursuing federal claims they otherwise would be able to advance (a so-called "prospective waiver"). JA1736. The court acknowledged that the choice-of-law provision in the agreements, which select Tribal law, do not nullify federal law and instead mirror standard choice-of-law provisions routinely enforced in federal court. JA1750–51. Nevertheless, the court found a prospective waiver based on the same venue provision described above. JA1737. The court again refused to sever the offending term from the arbitration agreements. JA1740–41.

Motions to Dismiss. The court rejected Appellants' arguments for dismissal based on the choice-of-law provision. The court did not dispute that Plaintiffs' claims depend upon application of Virginia's interest rate limit, that

the agreements unambiguously elect Tribal law, or that Virginia law gives "a choice-of-law provision in a contract the fullest effect intended by the parties absent unusual circumstances." JA1749. The court, however, concluded that the choice-of-law provision is unenforceable because it violates what the court described as "Virginia's compelling public policy against the unregulated lending of usurious loans." JA1755. The basis for that holding was the absence of an interest rate limit in Tribal law. JA1754–55. In making that determination, the court purported to distinguish the Virginia Supreme Court's decision in *Settlement Funding, LLC v. Van Neumann-Lillie*, 645 S.E.2d 436 (Va. 2007), which upheld the application of Utah law to a loan contract, even though Utah law contains no interest rate limit. JA1751–53.

The court further held that sovereign immunity did not bar Plaintiffs' claims against Tribal Appellants. The court permitted Plaintiffs to end-run around *Williams* by analogizing their state-law claims against the Tribal government to a lawsuit under *Ex parte Young*. In drawing that analogy, the court attempted to distinguish Supreme Court precedent holding that *Ex parte Young* does not permit state-law claims against state government officials. JA1767–68 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984)). The court reasoned that the Supreme Court had created

an exception to *Pennhurst* through a single sentence and citation in its decision in *Michigan v. Bay Mills Indian Community*, 572 U.S. 782 (2014). JA1767–68. To fit this case within that purported exception, the court further held that Tribal Appellants had engaged in off-reservation conduct by issuing loans over the internet to Virginia residents, even though the Tribe never set foot in Virginia, and Plaintiffs agreed in their loan contracts that the loans were made and accepted in Tribal jurisdiction. JA1769–72.

The court did, however, dismiss Plaintiffs' claim for injunctive and declaratory relief against Tribal Appellants under civil RICO, 18 U.S.C. § 1964. Relying on the statutory text, the court determined that RICO permits only the Attorney General to obtain injunctive and equitable relief; private plaintiffs are limited to a damages remedy. JA1784–88.

### E. This Appeal.

Appellants timely appealed the denial of their motions to compel arbitration, and Tribal Appellants also timely appealed the denial of sovereign immunity. JA1814–17; JA1825–27.

Appellants also requested certification of the choice-of-law ruling for interlocutory appeal. JA1818–21; JA1822–24. On February 20, 2020, the district court amended its January 9 Order to certify "whether enforcement of

the Choice-of-Law Provision would violate Virginia's . . . public policy against unregulated usurious lending." JA1829. On its own initiative, the court also certified whether private plaintiffs may seek "*Ex parte Young*-style" prospective relief under RICO. *Id.*

On March 26, 2020, this Court granted Appellants' petitions to accept the choice-of-law question for appeal and consolidated those appeals with the existing appeals. No. 20-1358, Dkt Nos. 2, 5; No. 20-1359, Dkt. Nos. 2, 5. By separate order on April 2, 2020, this Court directed the parties to address both questions certified by the district court. No. 20-1062(L), Dkt No. 32.

## STANDARD OF REVIEW

"This Court reviews de novo a district court's order denying a motion to compel arbitration under the Federal Arbitration Act." *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 453 (4th Cir. 2017). This Court also reviews de novo the choice-of-law and sovereign immunity issues presented in this appeal. *See Roe v. Doe*, 28 F.3d 404, 407 (4th Cir. 1994); *Williams*, 929 F.3d at 176.

## SUMMARY OF ARGUMENT

I. The district court erred several times over in denying Appellants' Motions to Compel Arbitration.

- 21 -

A. At the threshold, the district court should have honored the parties' agreements to have an arbitrator resolve any disputes about arbitrability. The court acknowledged that the delegation clause was "clear[] and unmistakabl[e]," but refused to enforce it based on the misguided notion that the parties attempted to place their agreements outside the FAA, depriving the arbitrator of the "tools necessary" to evaluate the agreements' validity. JA1723–35. The court's holding ignored both the agreements' plain language—which stated that "any arbitration *shall be governed by the FAA*," JA1185 (emphasis added)—and the well-established rule that any ambiguity in the agreements "should be resolved in favor of arbitration," *Porter Hayden Co. v. Cent. Indem. Co.*, 136 F.3d 380, 382 (4th Cir. 1998).

B. The district court compounded its error by invalidating the arbitration agreements for allegedly nullifying Plaintiffs' ability to pursue available federal claims. Precedent from this Court and the Supreme Court requires courts to evaluate claims of a "prospective waiver" only after arbitration, so courts can assess such claims informed by what actually happened in arbitration. Furthermore, the agreements do not nullify Plaintiffs' federal rights. On the contrary, they make numerous references to

arbitrating claims arising under federal law.  And again, any ambiguity should have been resolved in favor of arbitration.

C.  Even if the district court were correct that the agreements somehow nullified federal rights, it should have severed the offending language and submitted Plaintiffs' claims to arbitration.  It is clear from the face of the agreements that the parties intended to arbitrate regardless of what law applied.  Federal arbitration law required the court to honor that choice.

II.    Though the Court need not reach the issue if it reverses on arbitration, Virginia choice-of-law rules require enforcing the parties' agreement that Tribal law governs the loans.  Virginia has a strong public policy of allowing contracting parties to choose the law governing their contracts unless doing so would "shock[] . . . one's sense of right."  *Tate v. Hain*, 25 S.E.2d 321, 325 (Va. 1943).  The district court erred in predicting that Virginia courts would find the state's usury policy so compelling as to require disregarding the parties' choice of Tribal law.  The Virginia Supreme Court has enforced a choice-of-law provision selecting Utah law, which has no usury limitation, and nothing else in Virginia law justifies the district court's decision.

III.   Sovereign immunity bars Plaintiffs' attempt to avoid *Williams*. Plaintiffs have failed to identify the requisite Congressional authorization for their remaining state-law claims against the Tribe's governmental body.  And Supreme Court precedent forecloses an "*Ex parte Young*-style" state-law claim against government officials in their official capacity.  *Ex parte Young* justifies only claims alleging violations of *federal* law.

## ARGUMENT

## I.   THE DISTRICT COURT SHOULD HAVE ENFORCED THE PARTIES' AGREEMENT TO ARBITRATE.

The FAA "establishes a national policy favoring arbitration." *Preston v. Ferrer*, 552 U.S. 346, 349 (2008); *see also Porter Hayden*, 136 F.3d at 384. Arbitration is a "matter of contract," and the FAA allows parties to designate an arbitrator—rather than a court—to decide "the merits of a particular dispute." *Henry Schein v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).  Under the FAA, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

As this Court has explained, the "heavy federal presumption of arbitrability" requires that any doubts about the validity of an arbitration agreement "be resolved in favor of arbitration." *Porter Hayden*, 136 F.3d at

8342 (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989)). This rule applies to "the construction of the contract language itself" and any "defense to arbitrability." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

The district court cast these principles aside in denying Appellants' Motions to Compel Arbitration, committing three errors, each of which independently compels reversal.

## A.    The District Court Should Have Honored The Parties' Choice To Have An Arbitrator Resolve Challenges To The Arbitration Agreement.

### 1.    There Is A Strong Federal Policy Favoring Enforcement Of Delegation Clauses.

Parties can agree to arbitrate "threshold issues concerning the arbitration agreement" through a "delegation provision." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68 (2010). A delegation provision is "simply an additional, antecedent agreement," under which the parties "agree to arbitrate 'gateway' questions of 'arbitrability,'" such as whether the agreement to arbitrate is enforceable. *Id.* at 68–69.

When a contract "delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision." *Henry Schein*, 139 S. Ct. at 531. The "FAA operates" on a delegation agreement "just as it does on any other"

agreement. *Rent-A-Center*, 561 U.S. at 70. Thus, when a delegation clause "unambiguously require[s] arbitration of any issues concerning the 'enforceability' of the arbitration provisions," those issues must be resolved by the arbitrator. *Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 266 (4th Cir. 2019).

Critically, as this Court made clear in *Porter Hayden*, the "heavy federal presumption in favor of arbitrability," 136 F.3d at 384, applies in assessing the validity of delegation clauses. The question there was whether a choice-of-law provision in an arbitration agreement foreclosed application of the FAA, rendering a delegation clause unenforceable. The provision said nothing about the FAA, instead providing that "[a]ll disputes concerning the validity, interpretation and application of the Agreement . . . shall be determined in accordance with applicable common law of the states." 136 F.3d at 382. This Court acknowledged that "the broad, general language of the provision could be thought to encompass issues of arbitrability and, thus, to require the application of Maryland law" to the exclusion of the FAA. *Id.* But the Court held that a choice-of-law provision could be read to displace the FAA only if it did so "unequivocal[ly]." *Id.* at 383. Because the provision could also "reasonably be read merely as specifying that Maryland *substantive* law be

applied," the Court "*presume[d]* that the parties intended federal arbitration law to govern." *Id.* (emphases added).

In short, unless an arbitration agreement unambiguously forecloses application of the FAA, the parties' decision to delegate gateway questions to the arbitrator must be honored.

### 2.    The Parties Expressly And Validly Delegated Arbitrability Challenges To The Arbitrator.

The arbitration provision in Plaintiffs' loan agreements unambiguously provides that "all disputes, *including the scope and validity of this Arbitration Provision*," shall be arbitrated.   JA1184 (emphasis added). Indeed, the district court acknowledged that the agreements "clearly and unmistakably delegate[] arbitrability issues to an arbitrator by requiring that any challenge to the validity or scope of the Arbitration Provision—and not merely the loan agreement generally—be determined by an arbitrator." JA1724.   That should have ended the matter.   "[I]f a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein*, 139 S. Ct. at 530.

The district court nevertheless invalidated the delegation provision through a tortured reading of the agreements that ignored their plain language and the rule that ambiguities must be construed in favor of

arbitration.   According to the court, the agreements purport to nullify the FAA, preventing the arbitrator from evaluating Plaintiffs' challenges to arbitration.  JA1730–32.[5]  They do no such thing.

To the contrary, the express language of the agreements provides that "any arbitration shall be governed by the FAA":

> This Arbitration Provision is made pursuant to a transaction involving both interstate commerce and Indian commerce under the United States Constitution and other federal and tribal laws. Thus, *any arbitration shall be governed by the FAA* and subject to the laws of the Habematolel Pomo of Upper Lake.  If a final non-appealable judgment of a court having jurisdiction over this transaction and the parties finds, for any reason, that the FAA does not apply to this transaction, then Our agreement to arbitrate shall be governed by the laws of the Habematolel Pomo of Upper Lake.

JA1185 (emphasis added).  The agreements thus *require* arbitration to be governed by the FAA unless a court finds that the contract is outside the

---

[5] While the district court focused its analysis on the alleged nullification of the FAA, it occasionally referred to Plaintiffs' "right to pursue statutory remedies" more generally. JA1734; *see also* JA1735.  To the extent the court declined to enforce the delegation clause based on Plaintiffs' challenges to the arbitration agreement as a whole, that was error.  To avoid delegation of gateway questions to the arbitrator, one must establish the unenforceability of "the *delegation provision*, as opposed to the arbitration agreement as a whole."  *Minnieland*, 867 F.3d at 455; *see also Rent-A-Center*, 561 U.S. at 72 (to avoid delegation, one must "challenge[] the delegation provision *specifically*") (emphasis added).

statute's scope.   The agreements thereby protect any challenges to arbitrability that Plaintiffs have under the FAA.

In this respect, the case for arbitration is even stronger than in *Porter Hayden*, where this Court held that the parties must be "presume[d]" to have intended to apply the FAA in an agreement that was *silent* on the issue.  136 F.3d at 383.   Here, the agreements are explicit that the FAA "govern[s]." JA1185.

The district court's dismissal of this clear contractual language borders on nonsensical.   The court concluded that the "use of the word 'thus' to introduce" the italicized language about the FAA merely "confirm[s]" that the loan agreement concerns a transaction in interstate commerce.  JA1733.  But the preceding sentence makes that precise point, stating that the agreement involves "a transaction involving both interstate commerce and Indian commerce."[6]  JA1185.  On the district court's view, the invocation of the FAA in the second sentence serves no purpose, violating the principle—recognized

---

[6] The last sentence of the provision confirms the point, by addressing a circumstance in which a court rules that the transaction does *not* involve interstate commerce.   That provision has no application here, as it is undisputed that these loans are subject to the FAA's jurisdiction.  But the fact that the agreement specifies what happens when the FAA does not apply confirms that the FAA is the baseline rule.

by the court elsewhere—that one must read the agreement "to give effect to all of its terms." JA1733.

The district court also pointed to two other provisions, but neither nullify the agreements' express statement that the FAA "govern[s]." JA1185. The court first highlighted a provision choosing Tribal law, rather than state law, as governing in arbitration. JA1731.[7] But this choice-of-law provision for arbitration is materially indistinguishable from the general choice-of-law provision in the contracts, which the court held did *not* nullify any federal rights. JA1751 (language "select[ing] the law of another state to govern the interpretation and enforcement of a contract" still "implicitly allow[s] for the application of relevant federal statutes"). Further, the arbitration provisions elsewhere make clear that Tribal law applies only where it is "consistent with the Federal Arbitration Act (FAA)." JA1185. In other words, the FAA would take precedence over a Tribal law provision that purported to strip a right protected by the statute. For these reasons, the court was forced to

---

[7] The provision reads as follows: "The parties to such dispute will be governed by the laws of the Habematolel Pomo of Upper Lake and such rules and procedures used by the applicable arbitration organization applicable to consumer disputes, to the extent those rules and procedures do not contradict the express terms of this Arbitration Provision or the law of the Habematolel Pomo of Upper Lake, including the limitations on the arbitrator below." JA1185.

acknowledge that "at most," the choice-of-law provision for arbitration "create[s] ambiguity that should be resolved in favor of arbitration." JA1731.

The district court erred in invalidating the delegation clause by reading the foregoing provision "in tandem" with a provision designed to make arbitration *more accessible* to customers. *Id.* The latter provision allows borrowers to elect for arbitration to take place within 30 miles of their homes (or elsewhere), and then clarifies that such an election does not nullify the parties' choice of Tribal law, rather than state law, to govern in arbitration.[8] Contrary to the court's conclusion, nothing in the location-election provision "clearly evinces" an "intent to disclaim" the FAA. *Id.*

In sum, *Porter Hayden* required the district court to enforce the delegation clause unless the agreements "unequivocal[ly]" disavow the FAA. 136 F.3d at 383. Even if the district court's convoluted reading of the agreements were somehow plausible (and it is not), it is at least possible to read agreements that say that the FAA "govern[s]" as meaning exactly that.

---

[8] The provision reads as follows: "You have the right to request that arbitration take place within thirty (30) miles of Your residence or some other mutually agreed upon location, provided, however, that such election to have binding arbitration occur somewhere other than on Tribal land shall in no way be construed as a waiver of sovereign immunity or to allow for the application of any other law other than the laws of the Habematolel Pomo of Upper Lake." JA1185.

*Id.*  The district court thus erred in refusing to honor the parties' delegation agreement.

### B. The District Court Erred By Invalidating The Arbitration Agreements Under The Prospective Waiver Doctrine.

The district court compounded its error by nullifying the arbitration agreement as a whole on the ground that it "prospectively waives" federal rights.  JA1736.[9]  That decision was premature and wrong.

#### 1. Courts Cannot Entertain Prospective Waiver Challenges Prior To Arbitration.

The Supreme Court and this Court have both held that arguments about prospective waiver should be entertained only *after* arbitration, through a motion to vacate the proceeding under 9 U.S.C. § 10.

In *Aggarao v. MOL Ship Management Company*, 675 F.3d 355 (4th Cir. 2012), a plaintiff attempted to avoid arbitration by asserting that a choice-of-law provision applying the law of the Philippines prospectively waived his federal statutory claims.  Applying the Supreme Court's decision in *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995), this

---

[9] The Supreme Court has never refused to enforce an agreement to arbitrate based on the prospective waiver doctrine, and has referred to the doctrine as "originat[ing] in dictum."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235 (2013).

Court rejected the argument as premature. *Aggarao*, 675 F.3d at 371–73. The plaintiff was "not entitled to interpose his public policy defense, on the basis of the prospective waiver doctrine, until the second stage of the arbitration-related court proceedings—the award-enforcement stage." *Id.* at 373.

This rule makes good sense, because the arbitration proceeding sheds necessary light on whether there is in fact any impairment to a party's "right to pursue statutory remedies." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 636–37 n.19 (1985). Until arbitration occurs, "it is not established what law the arbitrators will apply to [plaintiff's] claims or that [plaintiff] will receive diminished protection as a result." *Sky Reefer*, 515 U.S. at 540. For example, in *Aggarao*, this Court explained that it is possible that the arbitrator would "apply United States law" or that the plaintiff "will be able to effectively vindicate the substance of those claims under Philippine law and obtain an adequate remedy." 675 F.3d at 373 n.16; *see also Asignacion v. Rickmers Genoa*, 783 F.3d 1010, 1021 (5th Cir. 2015) (prospective waiver claim is "premature" until "the arbitrators actually failed to address causes of action under American statutes").

This Court departed from these baseline rules in *Hayes v. Delbert Services Corporation*, 811 F.3d 666 (4th Cir. 2016), and *Dillon v. BMO Harris*

*Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017). In *Hayes*, this Court—without acknowledging *Aggarao*—invalidated an arbitration agreement based on prospective waiver prior to arbitration. 811 F.3d at 673–76. One year later, in *Dillon*, the Court explained that its approach in *Hayes* reflected a narrow exception to *Aggarao* and *Sky Reefer* for cases involving an unambiguous prospective waiver. 856 F.3d at 335–36.

Those portions of *Hayes* and *Dillon* are no longer good law, given the Supreme Court's subsequent decision in *Henry Schein*. That decision confirms that courts may not "short-circuit" arbitration even when the court believes an argument that will be raised to the arbitrator is "wholly groundless." 139 S. Ct. at 527–30. In other words, even if a court believes that an agreement unambiguously waives federal rights, the arbitrator must be given the chance to reach that conclusion in the first instance. *Id.* at 530 ("When the parties' contract assigns a matter to arbitration, a court may not resolve the merits of the dispute even if the court thinks that a party's claim on the merits is frivolous."). That conclusion flows directly from the text of the FAA, which "contains no 'wholly groundless' exception." *Id.*; *see id.* (courts "may not engraft [their] own exceptions onto the statutory text").

Under *Henry Schein*, the district court erred in short-circuiting arbitration and finding a prospective waiver before arbitration.

### 2. The Agreements Do Not Unambiguously Renounce Applicable Federal Law.

The district court's prospective waiver holding was also misguided on the merits, because there is no basis for finding the "unambiguous waiver" required under the outdated *Dillon* rule. 856 F.3d at 336.

Far from disclaiming federal law, the agreements repeatedly and expressly contemplate arbitration of any claims arising under it. The agreements require arbitration of "all tribal, *federal* or state law claims, disputes or controversies" and "all claims based upon a violation of any tribal, state or *federal constitution, statute or regulation*." JA1184 (emphases added). As the district court acknowledged, JA1739, the loan agreements also specify that the "transaction involv[es] both interstate commerce and Indian commerce *under the United States Constitution* and *other federal* and tribal laws." JA1185 (emphases added). And as previously detailed, the agreements fully embrace and preserve rights, remedies, and defenses under the Federal Arbitration Act. *See supra* at 13, 27–31.

The district court's prospective waiver analysis rested on the same contractual provisions as its nullification of the delegation clause, *see* JA1736–

- 35 -

37, and fails for the same reasons. As explained above, the contracts do not disclaim applicable federal law. Even if there were some ambiguity on that issue, it is at least plausible to read the agreements as preserving federal rights. In those circumstances, the agreements must be interpreted in favor of arbitrability—that is, in favor of federal law's applicability. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995).[10]

There is a telling contrast with the agreements in *Hayes* and *Dillon* that demonstrates why there is no prospective waiver here. In those cases, the loan agreements *expressly disclaimed* federal law. The contract in *Hayes* contained a "governing law" provision stating that "[n]either this Agreement nor Lender is subject to the laws of any state of the United States of America" and "that no United States state or federal law applies to this Agreement."

---

[10] As the district court implicitly acknowledged, JA1736–37, the loan agreements' preservation of the Tribe's sovereign immunity does not support a prospective waiver finding. As this Court recognized in *Hayes*, it does not trigger a prospective waiver for a party to claim, in arbitration, an immunity from federal law that it could also claim in litigation. *See* 811 F.3d at 675 (party cannot "flatly and categorically renounce the authority of federal statutes *to which it is and must remain subject*") (emphasis added). The issue in *Hayes* and *Dillon* was that the party invoking an arbitral process that nullified federal law had no plausible claim of sovereign immunity—it was not "a tribal-owned entity" that could "ground its renunciation of federal law in any claim of tribal affiliation." *Id.* at 673.

- 36 -

811 F.3d at 669–70.  Another provision of the contract declared that it "is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation . . . and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation." *Id.* at 669.  Likewise, in *Dillon*, the agreement provided that "no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation."  856 F.3d at 336.  No such express disclaimers exist here, and nothing in *Hayes* or *Dillon* suggests the language here constitutes a prospective waiver.[11]

The comparison to *Hayes* and *Dillon* is even more inapt because the Tribe, rather than displacing federal law, has incorporated it into its Consumer Financial Services Ordinance.  *See supra* at 9; *see, e.g.*, JA267 (Section 7.1: mandating that the lending businesses "shall at all times comply with . . . all other applicable Tribal, and *federal laws as applicable*") (emphasis added); JA250 (Section 1.1(i): the Tribal government must regulate its lending services

---

[11] While the loan agreement in *Hayes* added that the location of the arbitration would not trigger the application of "any law other than the law of the Cheyenne River Sioux Tribe," 811 F.3d at 675, that provision stood against the backdrop of the agreement's express rejection of federal law.  This Court did not suggest that this type of provision alone could constitute a prospective waiver of federal law, as the district court concluded here.

in a manner "commensurate with . . . *applicable federal law*") (emphasis added); *id.* (Section 1.1(j): lenders' data practices must "meet all . . . *applicable federal laws*") (emphasis added); JA275 (Section 9.2(d): "all Consumer Data must be protected . . . in accordance with . . . all *applicable federal laws*") (emphasis added); *id.* (Section 9.5(a): requiring lending businesses to "adhere to *all applicable federal laws* pertaining to Personal information") (emphasis added); JA267–68 (Section 7.2: mandating that the lending businesses act "in a manner consistent with principles of *federal consumer protection law,* including, *without limitation*," over a dozen federal laws) (emphases added).

The district court missed the point in disregarding this incorporation of federal law on the ground that the remedies provided by Tribal law might be different. JA1739–40. The point is this: The purpose of the agreement cannot have been to nullify federal law, when the Tribe's own law incorporates federal law. At the very least, this feature of Tribal law provides another strong reason to resolve any ambiguities in the agreement in favor of federal law's applicability.[12]

---

[12] The district court's focus on the adequacy of remedies underscores why a court should not decide prospective waiver preemptively, before an arbitration can take place. *See supra* at 32–34. As in *Aggarao*, it is possible that the arbitrator "will apply United States law" or that the plaintiff "will be

In sum, because the loan agreements allow Plaintiffs to raise in arbitration any federal claims they could raise in litigation, or at the least can be read to do so, the district court should have enforced the parties' agreement to arbitrate.

## C.  The District Court Erred In Refusing To Sever Any Offending Provisions From The Arbitration Agreements.

The district court's decisions to invalidate the delegation clause and then the arbitration agreement turned on a single provision of the contract stating that the location of arbitration does not alter the substantive law that applies. JA1731; JA1736–37.  Even if the court's reading were correct—and it is not—it should have severed that provision and enforced the parties' overriding commitment to arbitration.

Federal courts have consistently explained that offending provisions within an arbitration provision should be severed when necessary to save parties' general agreement to arbitrate—particularly where, as here, the arbitration provision includes an explicit severability provision.  *See* JA1185 ("If *any* of this Arbitration Provision is held invalid, the remainder shall

---

able to effectively vindicate the substance of those claims under [Tribal] law and obtain an adequate remedy."  675 F.3d at 373 n.16.

remain in effect.") (emphasis added).[13]  A contrary rule would undermine the FAA, because holding "entire arbitration agreements unenforceable every time a particular term is held invalid" would "discourage parties from forming contracts under the FAA and severely chill parties from structuring their contracts in the most efficient manner." *Gannon*, 262 F.3d at 682.

The district court erred in disregarding this established precedent and the parties' agreement.  The court declined to sever the provision it found problematic on the ground that the purported waiver of federal rights was the "essence" of the parties' agreement.  JA1734–35; JA1740–41.  As an initial matter, the existence of a severance provision refutes the notion that any one piece of the arbitration provision formed the "essence" of the parties' agreement such that it could not be severed.  Further, to the extent there was any "essence" to the arbitration provision, it was the parties' overriding

---

[13] *See, e.g.*, *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005); *Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 84–85 (D.C. Cir. 2005) (Roberts, J.); *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 (5th Cir. 2003); *Spinetti v. Serv. Corp., Int'l*, 324 F.3d 212, 219–23 (3d Cir. 2003); *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 682 (8th Cir. 2001); *see also In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 292 (4th Cir. 2007) (remanding for district court to determine whether arbitration's limitations period was enforceable and, if not, "whether severance of the limitations provisions, rather than invalidation of the arbitration agreements, would be the appropriate remedy").

commitment to arbitrate their claims regardless of the law that applied. The parties, after all, agreed that "all tribal, *federal or state law* claims, disputes or controversies" would be referred to arbitration. JA1184 (emphasis added).

The above provision distinguishes this case again from *Hayes* and *Dillon*, where the Court declined to sever the provisions nullifying federal law because it concluded that nullification was the core purpose of those agreements. *Hayes*, 811 F.3d at 676; *Dillon*, 856 F.3d at 336. Beyond the distinctions set forth above, *supra* at 36–39, those cases did not include contractual language expressly contemplating arbitration of federal claims.

The district court also missed the mark in refusing to sever on the ground that Tribal Appellants "took advantage of their superior bargaining power" and negotiated an arbitration agreement that was not in "good faith." JA1735; JA1741. The court did not (and could not) point to a single allegation in Plaintiffs' complaint suggesting that the agreement to arbitrate was imposed in bad faith. And disparate bargaining power, standing alone, does not render a contractual provision "fundamentally unfair." *See, e.g.*, *Torres v. SOH Dist. Co., Inc.*, 2010 WL 1959248, at *3 (E.D. Va. 2010) (enforcing forum selection clause); *see also Zaklit v. Glob. Linguist Sols., LLC*, 53 F. Supp. 3d 835, 845 & n.4 (E.D. Va. 2014) (explaining that any "disparity in bargaining

power must have specifically resulted in the inclusion of the [offending] provision," enforcing choice-of-law provision absent such allegations, and noting that "there is little difference between arbitration, forum-selection, and choice-of-law clauses for enforceability purposes"). Indeed, the district court's reliance on bargaining power disparity would require the invalidation of severability provisions in innumerable consumer contracts signed every day.

\*     \*     \*

Ultimately, all of the district court's errors on arbitration stem from a single fundamental mistake: reading a consumer-friendly provision of the parties' loan contracts, allowing borrowers to choose the location of arbitration, as nullifying federal law. There is no support for that conclusion— much less the unambiguous support required to justify the court's rulings.

## II. THE DISTRICT COURT SHOULD HAVE ENFORCED THE PARTIES' AGREEMENT TO APPLY TRIBAL LAW TO THEIR LOANS.

In countless contracts executed across the country each day, parties choose which body of law will apply to their agreement in order to provide certainty and clarity to their relationships. The parties here took the same approach and agreed that Tribal law would govern:

> **Governing Law:** This Agreement is made and accepted in the sovereign territory of the [Tribe], and shall be governed by

- 42 -

applicable tribal law, including but not limited to the [Ordinance].
You hereby agree that this governing law provision applies no
matter where You reside at the time You request Your loan from
[the relevant Tribal lending entity].

JA1186. This clause is materially indistinguishable from choice-of-law

provisions this Court routinely enforces, as well as what Plaintiffs termed "a

standard" choice-of-law provision set forth by the AAA.[14] The district court

agreed, noting that the language "proves analogous to other choice-of-law

provisions that select the law of another state to govern the interpretation and

enforcement of a contract." JA1751.

Because it is undisputed that all of Plaintiffs' claims depend on the

application of Virginia law, the choice-of-law provision should have compelled

dismissal.[15] The district court's decision to invalidate it nevertheless, based on

---

[14] *See Hengle v. Asner*, No. 3:19-cv-250 (E.D. Va.), Pls.' Opp. to Mot. to
Compel Arb., ECF No. 96, at 9 n.6 (describing a "standard governing law
provision in an arbitration agreement" as the following: "This Agreement and
the rights of the parties hereunder shall be governed by and construed in
accordance with the laws of the State of _____, exclusive of conflict or
choice of law rules.").

[15] As the district court recognized in granting Appellants' § 1292(b)
motions, reversal on its choice-of-law ruling would not itself compel dismissal
of the complaint, but would "heavily influence[]" any remaining arguments
Plaintiffs might make, as the public policy issue addressed in the ruling is "the
strongest determining factor of the appropriate law to apply in this case and,
ultimately, Plaintiffs' right to relief." JA1844–45.

predictions about Virginia usury policy, contravenes over a century of Virginia Supreme Court precedent compelling enforcement of choice-of-law clauses, including where the chosen law does not contain a usury limit.[16]   Nothing in Virginia law suggests that the Commonwealth's policy decisions regarding usury override its foundational commitments to allowing parties to decide how to order their contractual relationships and to respecting the policy choices of other sovereigns.

### A.    Virginia Has A Strong Public Policy Of Enforcing Parties' Choice Of Law.

For over a century, the Commonwealth has "recognized that parties to a contract may agree in advance which jurisdiction's law will apply to their transaction." *Zaklit v. Glob. Linguist Sols., LLC*, 2014 WL 3109804, at *5 (E.D. Va. July 8, 2014) (citing *Union Cent. Life Ins. Co. v. Pollard*, 94 Va. 146 (1896)).  Where, as here, "parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, [Virginia courts] will recognize such agreement and

---

[16] This Court's precedent requires the application of Virginia conflict-of-law rules in this case.  *See In re Merritt Dredging Co.*, 839 F.2d 203, 205 (4th Cir. 1988).

enforce it, applying the law of the stipulated jurisdiction." *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E. 2d 804, 807 (Va. 1990).

This Court has routinely applied this rule, citing the Virginia Supreme Court's decades-old directive that "Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999) (citing *Tate*, 25 S.E.2d at 324); *see also, e.g.*, *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) (same).

The Commonwealth's rule makes good sense. It "gives effect to the legitimate expectations of the parties" by making it possible for them to know in advance what rules will govern any disputes. *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 654 (4th Cir. 2010). For this reason, contractual choice-of-law provisions are "an almost indispensable precondition to achievement of the orderliness and predictability essential to" economic relations. *Id.* (quoting *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 518 (1974)); *see also JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc.*, 2017 WL 4003026, at *10 (E.D. Va. Sept. 11, 2017) (giving effect to choice-of-law clauses "provides certainty and consistency"). Enforcing choice-of-law provisions is also consistent with the principle of comity: A state generally should not

impose its own policy judgment in favor of another sovereign's when the parties have elected the other sovereign's law. *See, e.g.*, *Watkins v. M/V London Senator*, 112 F. Supp. 2d 511, 515 (E.D. Va. 2000).

As the district court acknowledged, only a "compelling" public policy against enforcement can justify invalidating a choice-of-law clause. JA1754 (citing *Willard v. Aetna Cas. & Sur. Co.*, 193 S.E.2d 776, 779 (Va. 1973)). Invalidation is allowed only in extraordinary circumstances, involving "something immoral, shocking to one's sense of right." *Tate*, 25 S.E.2d at 325. As explained below, the Virginia Supreme Court has already concluded that this high standard is not met where parties to a loan choose the law of a jurisdiction without an interest rate limit.

### B.    The Virginia Supreme Court's *Settlement Funding* Decision Requires Enforcement Of The Choice-of-Law Provision.

The Virginia Supreme Court's decision in *Settlement Funding* compels reversal of the decision below. *Settlement Funding* involved a loan agreement containing a choice-of-law provision electing Utah law, which—like Tribal law—"has not established any limits on maximum rates of interest for consumer loans." 645 S.E.2d at 439. The Virginia Supreme Court held that Utah law governed the contract, notwithstanding Virginia's different approach to usury limits. *Id.*    That holding squarely applies here. Indeed,

neither the district court nor Plaintiffs disputed that, if the Virginia Supreme

Court in fact concluded that Utah law applied in *Settlement Funding*, then the

choice-of-law provision here must be enforced.

The district court instead attempted to evade *Settlement Funding* by

rewriting the decision's holding. The court characterized the decision as

"address[ing] only the evidentiary issue of whether [the lender's successor]

had met its burden to prove the substance of Utah law." JA1753. It is true

that the Virginia *circuit court* concluded that it could not enforce Utah law

because there was insufficient proof of its contents. *Commonwealth, State

Lottery Dep't v. Settlement Funding, LLC*, 2006 WL 727873, at *2 (Va. Cir.

2006). But on appeal, the Virginia *Supreme Court* went further, holding not

only that there was "sufficient information regarding the substance of Utah

law," but also that "the circuit court erred in refusing *to apply Utah law* in the

construction of the loan agreement." *Settlement Funding*, 645 S.E.2d at 439

(emphasis added).[17]   Confirming the point, the Virginia Supreme Court

---

[17] This second aspect of the Virginia Supreme Court's holding is why it saw no need to address "Settlement Funding's remaining assignment of error," 645 S.E.2d at 439 n.2, that "the circuit court erred in . . . applying Virginia usury statutes and concluding the interest rate for the subject loan was usurious," *id.* at 438. Because Utah law applied, the question of how Virginia law would apply was irrelevant.

reversed the decision below, rather than simply vacating it for further proceedings. *Id.*

Moreover, the Virginia Supreme Court issued that ruling after being presented with the same public policy argument raised by Plaintiffs and adopted by the district court here. The borrower in *Settlement Funding* argued repeatedly that "Virginia's usury laws 'represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary of permitting this policy to be thwarted.'" Br. of Appellee, 2006 WL 4701777, at *4–5 (quoting *Heubusch & Reynolds v. Boone*, 192 S.E.2d 783, 789 (1972)); *see also id.* at *4 (arguing that "the specific contract provision in question—the interest rate provision—is also against Virginia public policy"); *id.* ("All a money lender would need to do to avoid Virginia's usury laws would be . . . [to] place in the loan agreement a Utah choice of law provision."). Settlement Funding directed the majority of its reply brief to this precise argument. Reply Br. of Appellant, 2007 WL 2296007, at *3–5. And yet the Virginia Supreme Court concluded that the parties' choice of Utah law

should be honored, notwithstanding Utah's different policy regarding interest rates.[18]

The proceedings on remand in *Settlement Funding* confirm that the Virginia Supreme Court did not merely resolve a threshold evidentiary issue, as the district court suggested. JA1753. If the district court's reading were correct, the lower court on remand would have addressed whether the parties' choice of Utah law should be set aside based on the borrowers' Virginia public policy argument. But the circuit court engaged in no such analysis. Instead, the court took the application of Utah law as a given, following the Virginia Supreme Court's holding, and ruled that the loan agreement at issue was "not usurious" under *Utah* law. *Commonwealth, State Lottery Dep't v. Settlement Funding, LLC*, 2008 WL 6759945, at *2 (Va. Cir. 2008).

The only remaining basis offered for disregarding *Settlement Funding* was the district court's citation to one other federal district court opinion and

_____

[18] In opposing § 1292(b) review of this issue, Plaintiffs erroneously attempted to distinguish *Settlement Funding* on the ground that the Utah bank fit into a statutory exemption to Virginia's interest rate limit. *Treppa v. Hengle*, No. 20-164 (4th Cir.), Pls.' Opp. to § 1292(b) Pet., Dkt No. 14, at 17–18. The bank made this precise argument to the circuit court in *Settlement Funding*. *See Commonwealth, State Lottery Dep't*, 2006 WL 727873, at *3. But the Virginia Supreme Court decided the case not by reference to that Virginia law, but by reference to Virginia's public policy of enforcing the parties' choice of law. *See Settlement Funding*, 645 S.E.2d at 438.

a case from a Virginia circuit court.  JA1754.  But those decisions cannot justify disregarding the clear holding of Virginia's highest court on an issue of Virginia law.   The Virginia circuit court decision is in any event distinguishable:  There, the court declined to apply Utah law to a suit brought by the Commonwealth because neither the lender nor the borrower had any legitimate nexus to Utah, unlike in *Settlement Funding*.  *See Commonwealth v. NC Fin. Sols of Utah, LLC*, 2018 WL 9372461, at *9–10 (Va. Cir. 2018) (noting that the Commonwealth alleged, among other things, that the defendant was not in fact incorporated or housed in Utah).  Here, the Tribal businesses' nexus to the Tribe is clear.

In sum, the district court elevated Virginia's usury limitations over Virginia's policy of honoring the parties' choice of law, but the Virginia Supreme Court struck precisely the opposite balance in *Settlement Funding*. That decision compels reversal.

### C.    Nothing Else In Virginia Law Justifies Invalidating The Choice-Of-Law Provision.

*Settlement Funding* should have eliminated the need for any further analysis of Virginia law.  But even setting that decision aside, there was no basis for the district court to conclude that Virginia has a "compelling" public

policy against usury that would justify invalidating the choice-of-law clause. JA1755.

To begin, the district court's emphasis on the alleged "anti-waiver" provision in Virginia law was misguided. The district court believed that Virginia law necessarily voids any attempt to set aside Virginia's usury protections. *See* JA1755 (citing Va. Code § 6.2-306(A)). But the text of that provision does no such thing: It voids only contractual provisions that "waive[] the benefits of this chapter or release any rights [a borrower] *may have acquired under this chapter*." Va. Code § 6.2-306(A) (emphasis added). Here, Plaintiffs never acquired any benefits or rights under Virginia law because they agreed to apply Tribal law instead.[19]

Moreover, examining Virginia usury law makes it impossible to conclude that charging more than the statutory rate is "something immoral, shocking

---

[19] In opposing § 1292(b) review, Plaintiffs suggested that the Virginia Supreme Court has confirmed that the anti-waiver provision takes precedence over any contractual provision that departs from Virginia usury law, including a choice-of-law provision. *See Treppa v. Hengle*, No. 20-164 (4th Cir.), Pls' Opp. to § 1292(b) Pet., Dkt. No. 14, at 12–15. Not so. The decision they cited, *Blake Constr. Co./Poole & Kent v. Upper Occoquan Sewage Auth.*, 587 S.E.2d 711, 719 (Va. 2003), did not even address Virginia usury law. It simply concluded that there was no implied exception to a different Virginia anti-waiver statute in connection with a contract that was governed *by Virginia law. See id.* at 717–18. The decision thus had nothing to say about the question here.

to one's sense of right," such that the parties' choice of Tribal law can be set aside. *Tate*, 25 S.E.2d at 325.

For starters, Virginia's statutory rate has almost too many exceptions to count. The provision setting forth the 12 percent rate highlights nine separate categories of "[l]aws that permit payment of interest at a rate that exceeds 12 percent per year." Va. Code §§ 6.2-303(B)(1)–(9). Those laws in turn set forth dozens of exceptions. *See, e.g.*, Va. Code §§ 6.2-309–329.

Those exceptions cover virtually every commonly-used financial service. To provide just a few examples, Virginia law sets *no* interest rate limit for loans of $5,000 or more made by "certain financial institutions," Va. Code § 6.2-316; certain loans for business or investment purposes, *id.* § 6.2-317; loans by credit unions, *id.* § 6.2-318(B), (D); loans by pension plans, *id.* § 6.2-319(B); select loans by industrial loan associations, *id.* § 6.2-320; educational loans by banks or savings institutions, *id.* § 6.2-323; and certain real estate loans, *id.* §§ 6.2-325–26; *see also Smith v. Anderson*, 801 F.2d 661, 665 (4th Cir. 1986) (noting that a prior statutory exception to the general usury statute "may be read as permitting a loan within its coverage at any rate of interest"). Virginia also allows banks and savings institutions issuing installment loans to impose unlimited "finance charges and other charges and fees." Va. Code § 6.2-309;

*see also id.* § 6.2-311(A) (closed-end installment loans by sellers of goods or services); *id.* § 6.2-313(A) (open-end credit extended by banks or savings institutions); *see id.* § 6.2-314 (certain motor vehicle purchase loans).

Further, the specific provisions Plaintiffs have invoked here, regarding consumer finance companies, would not prohibit Plaintiffs' loans even if Virginia law were incorrectly held to apply, because those laws do not apply to lenders located outside Virginia.  *See* JA1469 (citing Va. Code § 6.2-1541). When the Virginia legislature wants to apply its statutes to businesses that do not have a physical presence in the Commonwealth, like the Tribal businesses, it does so expressly.  *See, e.g.*, *id.* § 6.2-1801(A) (prohibiting certain payday lending activity "whether or not the person has an office or conducts business at a location in the Commonwealth, except in accordance with the provisions of this chapter and without having first obtained a license under this chapter from the Commission"); *id.* § 6.2-1901 (money-order sales); *id.* § 6.2-2001 (debt-management plans); *id.* § 6.2-2201 (certain car loans).  Likewise, the Virginia legislature knows how to attempt to apply its statutes to certain lenders who operate via the internet. *See id.* §§ 6.2-1827 (payday lending), 6.2-2225 (auto title loans).  It took neither step with respect to consumer finance

companies, which is the category alleged to encompass the Tribal lending entities.  *See* JA1469.[20]

Finally, Virginia's own actions eliminate any doubt about whether its public policy regarding usury rates is so overwhelming as to nullify Plaintiffs' agreements.  In 2018 correspondence with a borrower who took out a loan from one of the Tribal lending entities, the Commonwealth's Bureau of Financial Institutions explained that the entities are "not required to be licensed under the laws that are enforced by the Bureau," which include Title 6.2 of the Virginia Code.  JA171.  The Bureau further noted that the borrower's loan agreement states that the entities are arms of "a federally recognized Native American Tribe."  *Id.*  It is hard to understand why Virginia would disclaim the ability to enforce its laws against the Tribal entities if the Commonwealth's

---

[20] Confirming the point, the Virginia legislature considered and rejected a statutory amendment in 2018 that would have extended the consumer finance companies statute to all internet lenders.  *See, e.g.*, *H. Comm. on Labor & Commerce Meeting*, 2018 Va. Leg. Sess. (Feb. 8, 2018) (statement of Del. Terry Kilgore, Mem. H. Comm. on Labor & Commerce, at 3:23:33–45) (explaining that, under the proposed amendment, "internet lenders are required to obtain a license now, before they weren't, internet lenders must comply with all provisions of Virginia's consumer finance laws"), https://sg001-harmony.sliq.net/00304/Harmony/en/PowerBrowser/PowerBrowserV2/20200 531/-1/4239; State Corporation Commission, 2018 Fiscal Impact Statement HB1248 ("The [proposed] measure also authorizes the Bureau to license out-of-state consumer finance companies, including lenders that operate via the Internet."), https://perma.cc/QJA7-GU6D.

law set forth an iron-clad anti-usury policy that requires application of Virginia law to Plaintiffs' loans.

Indeed, a ruling prioritizing Virginia's interest rate policy over its policy enforcing choice-of-law clauses would place the Commonwealth at odds with the majority of states striking the opposite balance. *See, e.g.*, *In re Rent-Rite Superkegs W., Ltd.*, 603 B.R. 41, 77-78 (Bankr. D. Colo. 2019) (Colorado); *Schoemann v. eWellness Healthcare Corp.*, 2017 WL 4701317, at *4 (M.D. La. Oct. 19, 2017) (California), *vacated in part on other grounds on reconsideration,* 2018 WL 4346882 (M.D. La. Jan. 19, 2019); *L'Arbalete, Inc. v. Zaczac*, 474 F. Supp. 2d 1314, 1321 (S.D. Fla. 2007) (Florida); *Saturn Capital Corp. v. Dorsey*, 2006 WL 1767602, at *9 (Tex. App. June 29, 2006) (Texas); *Sheer Asset Mgmt. Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I. 1999) (Rhode Island); *Exch. Bank & Tr. Co. v. Tamerius*, 265 N.W.2d 847, 850 (Neb. 1978) (Nebraska); *Big Four Mills, Ltd. v. Commercial Credit Co.*, 211 S.W.2d 831, 836-37 (Ky. 1948) (Kentucky). A federal court predicting state law should assume that the state will favor the majority rule absent some indication in the case law to the contrary—and here there is none at all.

### D.    Tribal Law Provides Ample Consumer Protections.

The district court also erred in concluding that Tribal law lacks comparable consumer protections to Virginia law.  JA1755–56.  To the extent the content of Tribal law factors into the choice-of-law analysis, the relevant question is not whether the Tribe provides *different* consumer protections than Virginia, but whether there is so stark an absence of consumer protections as to "shock[] . . . one's sense of right."  *Tate,* 25 S.E.2d at 325.  If mere policy differences were enough, choice-of-law provisions would rarely be enforceable.  Here, Virginia law's high standard for invalidation of choice-of-law provisions cannot be met.

As explained above, Tribal law provides substantial protections to consumers by incorporating federal consumer protection laws.  *See supra* at 9.  Further, the Tribe's Regulatory Commission—led by an experienced Tribal member and supported by experts in federal consumer law—ensures compliance with those laws through robust regulation.  *Id.*  In some material respects, this legal regime provides greater protection than federal law, *see Hengle v. Asner,* No. 3:19-cv-250 (E.D. Va.), Amicus Br. of Comm'n, ECF No. 76, at 6 & n.2, and has contributed to a consumer complaint rate of less than 1%, *see supra* at 14–15.

On the rare occasions that customers have complaints, the Tribe has guaranteed them impartial dispute resolution procedures. The Tribe continues to develop its court system, and for the time being, has chosen to resolve disputes by referring them to fair proceedings before impartial arbitrators. *See supra* at 11–13. The Tribe complies with arbitral rules of procedure set by industry leaders (JAMS and AAA), makes arbitration accessible to consumers by fronting the costs and holding arbitrations in convenient locations, does not constrain the arbitrator's efforts to interpret and apply Tribal law by reference to the federal laws it incorporates, and must abide by the arbitrator's findings.

The Tribe's sovereign decision not to also include an interest rate limit does not justify disregarding its law. Federal law contains no interest rate limit for loans in interstate commerce, and several states do not impose such a limit either.[21] As these jurisdictions show, an interest rate limit is not a

---

[21] In addition to Utah, Nevada has no interest rate limit. *See Consumers Distrib. Co. v. Hermann*, 812 P.2d 1274, 1278 (Nev. 1991) ("Nevada has no statute which precludes high interest rates."); *EMA Fin., LLC v. NFusz, Inc.*, 2020 WL 1272189, at *7, *10 (S.D.N.Y. 2020) ("Having concluded that the parties' choice-of-law must be enforced and thus that Nevada usury law governs the transaction, defendant's usury defense fails as a matter of law."). A number of other states generally do not limit interest rates that are agreed to in a written contract. *See, e.g.*, Consumer Finance Frequently Asked

necessary feature of an adequate consumer protection regime, and the absence of such a limit is not so unusual as to "shock[] . . . one's sense of right." *Tate*, 25 S.E.2d at 325; *Chesapeake Supply & Equip. Co. v. J.I. Case Co.*, 700 F. Supp. 1415, 1421 (E.D. Va. 1988) ("Merely because one [forum's] law differs from Virginia's does not, *ipso facto*, justify refusal to adhere to comity principles."); *cf. California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 219–22 (1987) (recognizing tribes' sovereign right to regulate certain business activities differently from how states might regulate them). Indeed, federal law encourages Tribes to make such quintessentially sovereign legal policy choices by developing their own laws.[22]

---

Questions, Idaho Dep't of Finance, https://perma.cc/5LYD-ZXG8 (last visited May 31, 2020) ("Idaho usury laws were repealed by the legislature in 1983, so there is no cap on the interest you can be charged.").

[22] *See, e.g.*, Indian Tribal Justice Support Act, 25 U.S.C. § 3601(1), (4) (recognizing government-to-government relationship between the United States and tribes and finding that "Indian tribes possess the inherent authority to establish their own form of government, including tribal justice systems"). In fact, the federal government has specifically encouraged the Tribe's legal development through a recent grant earmarked for the continued development of its judicial system and legal code. *Hearing on Tribal Programs: Before the H. Sub. Comm. on Interior, Env't & Related Agencies*, 116th Cong. (Feb. 12, 2020) (statement of Tracey Treppa, Vice-Chairperson of the Habematolel Pomo of Upper Lake, at 3), https://perma.cc/3DL2-Y79C.

## III.  SOVEREIGN IMMUNITY BARS PLAINTIFFS' STATE-LAW CLAIMS AGAINST THE TRIBE'S GOVERNMENT.

There is no question that sovereign immunity precludes Plaintiffs from seeking injunctive relief against the Tribe itself.  Tribes have "inherent sovereign authority," *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991), and one "core aspect[]" of that sovereignty "is the 'common-law immunity from suit traditionally enjoyed by sovereign powers,'" *Bay Mills*, 572 U.S. at 788 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)).

There is similarly no question that sovereign immunity precludes Plaintiffs from seeking injunctive relief against the Tribal businesses.  In *Williams*, this Court held that entities similar to the Tribal businesses are entitled to share in tribal immunity as "arms of the tribe."  929 F.3d at 177.  And there is no dispute that the Tribal businesses here satisfy the *Williams* test:  Just three weeks after they filed their motion to dismiss the original complaint—and just over one week after this Court issued its decision in *Williams*—Plaintiffs amended their complaint to drop all claims against the businesses.  *See supra* at 15–16.

Changing the case caption should not change the outcome.  If anything, Plaintiffs' decision to sue the members of the Tribal government who pass and

implement the Tribe's laws should make this an even *easier* case for sovereign immunity. Plaintiffs' lawsuit is an attack on the Tribe's legal policy choices, which are the product of a quintessentially sovereign legislative function. *See Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (recognizing absolute immunity for local legislators); *Runs After v. United States*, 766 F.2d 347, 354 (8th Cir. 1985) (extending legislative immunity to "individual members of [a] Tribal Council"). Because Plaintiffs' claims against Tribal Appellants are "in substance" a suit to "restrain[] or otherwise affect[] their action as state officers," dismissal is warranted. *Worcester Cty. Tr. Co. v. Riley*, 302 U.S. 292, 296 (1937).

## A. Neither Congress Nor The Constitution Permits Plaintiffs' State-Law Claims.

The absence of Congressional authorization for Plaintiffs' claims against Tribal Appellants should have been the end of their suit. As the Supreme Court has repeatedly affirmed, lawsuits that are in substance against a tribe require explicit Congressional sanction. "[U]nless and until Congress acts, the tribes retain their historic sovereign authority." *Bay Mills*, 572 U.S. at 788. The "baseline position . . . is tribal immunity[,] and 'to abrogate such immunity, Congress must unequivocally express that purpose.'" *Id.* at 790 (quoting *C & L Enters., Inc. v. Citizen Band Potawatomi Tribe of Okla.*, 532

U.S. 411, 418 (2001)) (alterations omitted).  Here, Plaintiffs repeatedly failed to identify any such authorization for their claims, requiring their dismissal. *See id.* at 791 ("The upshot is this: Unless Congress has authorized Michigan's suit, our precedents demand that it be dismissed.").

Plaintiffs' invocation of *Ex parte Young* is not a substitute for Congressional authorization.  That legal theory provides a pathway around sovereign immunity only where a plaintiff "alleges an ongoing violation of *federal* law and seeks relief properly characterized as prospective."  *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (emphasis added).  The requirement of a federal claim is not a mere formality—it is the very foundation of the doctrine.  The reason the *Young* doctrine exists is to ensure that federal courts can vindicate the supremacy of federal law.  *Ex parte Young*, 209 U.S. 123 (1908); *see also, e.g.*, *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002).  While state and tribal officials ordinarily have sovereign immunity, official actions that are illegal under federal law are considered "void" under the federal Constitution.  *Pennhurst*, 465 U.S. at 102 (quoting *Young*, 209 U.S. at 160).  For such actions, the "supreme authority of the United States" strips away any colorable claim to sovereign immunity.  *Id.*

The Supreme Court thus held in *Pennhurst* that *Ex parte Young* does not permit lawsuits seeking to bypass sovereign immunity to enjoin violations of *state* law. 465 U.S. at 104–06. Such lawsuits do not "vindicate the supreme authority of federal law." *Id.* at 106. And so the "need to reconcile [the] competing interests" of the supremacy of federal law and state sovereign immunity is "wholly absent." *Id.* Accordingly, under a straightforward application of *Pennhurst* and *Ex parte Young*, Plaintiffs' attempt to enforce state law against Tribal Appellants should have been dismissed.

That Plaintiffs have sued Tribal (as opposed to state) officials provides no basis for evading *Pennhurst*'s holding. The district court attempted to limit *Pennhurst* by suggesting it foreclosed only suits seeking to enforce a state's own law against its officials, reasoning that states can authorize their officials to violate their own laws, whereas "tribes cannot empower their officials to violate state law." JA1767. But under that logic, private plaintiffs could hale state officials into federal court for alleged violations of *another state's* laws because states likewise cannot authorize their officials to violate the law of a co-equal sovereign.

That facially absurd result exposes the error in the district court's reasoning. Immunity is the "baseline" position for both states and tribes. *Bay*

*Mills*, 572 U.S. at 790. The question is whether there is any Constitutional basis for altering that baseline, as there is when the supremacy of federal law is at stake. As in *Pennhurst*, Plaintiffs have identified no provision of the Constitution suggesting any federal interest in state-law disputes between tribal officials and private citizens, or suggesting that the federal Constitution allows state law to trump tribal law in the same way federal law trumps state law when they conflict.[23]

The district court's attempt to distinguish tribes from states also fails because the Supreme Court, this Court, and Congress have all made clear that tribes are entitled to equal treatment with respect to sovereign immunity. *See, e.g.*, *Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) (analogizing tribal immunity to state sovereign immunity principles); *Williams*, 929 F.3d at 176–77 (same); 12 U.S.C. § 5481(27) (provision of Consumer Financial Protection Act requiring states and tribes to be treated alike). The district court did not answer, let alone address, any of these authorities in its opinion.

---

[23] The district court did not fill this gap for Plaintiffs by citing the "federal government's strong interest in providing a neutral forum for the peaceful resolution of disputes between domestic sovereigns." JA1768 (quoting U.S. Const. art. III, § 2, cl. 2). This is not a "dispute[] between domestic sovereigns"—Plaintiffs are private citizens. Tribal Appellants are aware of no decision interpreting that language to provide a pathway to federal court for private plaintiffs raising state-law claims.

In sum, there was no basis for the district court to authorize a new "*Ex parte* Young-style*" claim.  JA61.  The Supreme Court has "often explained" that "federal courts are courts of limited jurisdiction."  *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U. S. 375, 377 (1994)).  Their power "is not to be expanded by judicial decree."  *Kokkonen*, 511 U.S. at 377.  Just this Term, the Supreme Court emphasized that, in considering whether to extend existing causes of action or recognize new ones, its "watchword is caution."  *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020) (refusing to recognize a cause of action under *Bivens*).  The district court erred by taking the opposite approach.

## B.  *Bay Mills* Did Not Create A New Cause Of Action For State-Law Claims Against Tribal Officials.

According to the district court, in *Bay Mills*, the Supreme Court contravened all the foregoing principles and created a new state-law cause of action against tribal government officials.  Following the Second Circuit's lead, *see Gingras v. Think Finance, Inc.*, 922 F.3d 112, 121 (2d Cir. 2019), the district court based this counterintuitive conclusion on a stray citation in dicta in *Bay Mills*.  *See* JA1766–67 (citing *Gingras*, 922 F.3d at 122).

As this Court has repeatedly held, dicta cannot overcome decades of Supreme Court precedent.  *Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle,*

*Inc.*, 401 F.3d 560, 572–73 (4th Cir. 2005); *see also, e.g.*, *United States v. Pasquantino*, 336 F.3d 321, 329 (4th Cir. 2003) (*en banc*) ("[D]icta . . . cannot serve as a source of binding authority in American jurisprudence."), *aff'd*, 544 U.S. 349 (2005) (citation omitted).   Indeed, *Yamaha* involved a situation virtually identical to the one here.   The district court rejected a dormant Commerce Clause challenge to a state statute, relying on language in a footnote in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997).   *See Yamaha*, 401 F.3d at 572.   On appeal, this Court concluded that the *Tracy* footnote was dicta, because the language at issue was not necessary to the outcome of that case.   *See id.* at 572–73.   And because that dicta conflicted with decades of Supreme Court precedent, this Court set it aside and reversed the district court's decision.   *Id.*   The Supreme Court denied review.   *Jim's Motorcycle, Inc. v. Smit*, 546 U.S. 936 (2005).

Plaintiffs' theory here similarly rests on dicta that conflicts with the settled Supreme Court precedent discussed above.   *Bay Mills* involved a statutory interpretation question—whether the Indian Gaming Regulatory Act ("IGRA") abrogated a tribe's immunity from a suit by Michigan seeking to enjoin off-reservation gaming.   572 U.S. at 786–88.   The Court began from the baseline principle that the suit could not proceed unless Congress had

authorized it. *Id.* at 790. Because IGRA—by its plain text—abrogates sovereign immunity only for conduct occurring on tribal lands, the Court barred Michigan's suit to enjoin conduct occurring elsewhere. *Id.* at 791–94.

Because IGRA itself contained all the answers to the question presented, the Court's discussion of Michigan's policy arguments was dicta. *See, e.g.*, *Metro. Stevedore Co. v. Rambo*, 515 U.S. 291, 294 (1995) ("[W]hen a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."). One such argument was that denying jurisdiction under IGRA would leave the state powerless to regulate off-reservation gaming activity even though it could sue (under IGRA) for on-reservation activity. The Court first observed that there were good reasons for Congress to focus IGRA on tribal lands. *Id.* at 794–95. It then went on to note that Michigan was in fact not powerless because it had several avenues to regulate off-reservation conduct, including denying a gaming license, filing criminal charges, or, as relevant here, bringing a lawsuit to enjoin tribal officials from illegal activity. *Id.* at 795–97. In support of the last option, the Court cited two cases involving textbook applications of the *Ex parte Young* doctrine to alleged violations of *federal* law: *Young* itself and *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), which

involved a suit seeking injunctive relief under the federal Indian Civil Rights Act. *Bay Mills*, 572 U.S. at 796. Nothing about this section of the opinion was "necessary to [the] result" in the case. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). It is therefore dicta and cannot be read to contravene settled precedent. *See id.*

Even accepting Plaintiffs' incorrect argument that the Court's analysis of alternative remedies was necessary to the result, and thus not dicta,[24] there is no reason to read *Bay Mills* as opening an unprecedented new door to federal court. Plaintiffs' entire case against Tribal Appellants rests on the underlined citation in the following paragraph from *Bay Mills*:

> And if Bay Mills went ahead anyway, Michigan could bring suit against tribal officials or employees (rather than the Tribe itself) seeking an injunction <u>for, say, gambling without a license. See §432.220; see also §600.3801(1)(a) (West 2013)</u> (designating illegal gambling facilities as public nuisances). As this Court has stated before, analogizing to *Ex parte Young*, 209 U.S. 123 (1908), tribal

---

[24] The district court's claim that three separate opinions in *Bay Mills* recognized the availability of state-law *Ex parte Young* actions, JA1766–67, is both irrelevant and wrong. Determining whether language in an opinion is a holding or dicta is a matter of substance, not a counting exercise. *See Seminole Tribe*, 517 U.S. at 67. More fundamentally, the cited opinions simply do not pass on the availability of state-law *Ex parte Young* suits. In her concurring opinion, Justice Sotomayor mentions the possibility of prospective relief only in passing and only in describing a concern raised by the dissent. *See Bay Mills*, 572 U.S. at 809 (Sotomayor, J., concurring). And Justice Thomas does not mention *Ex parte Young* claims at all—never mind *Ex parte Young* claims based on *state* law. *See id.* at 814–31 (Thomas, J., dissenting).

immunity does not bar such a suit for injunctive relief against *individuals*, including tribal officers, responsible for unlawful conduct. See *Santa Clara Pueblo*, 436 U.S., at 59.

572 U.S. at 796 (first emphasis added). According to Plaintiffs, through this citation, the Court created a new cause of action allowing state-law claims against tribal officials, thereby silently overruling three separate lines of precedent: (1) the line of cases—including *Bay Mills* itself, *see* 572 U.S. at 788–91, 800–04—holding that only Congress can abrogate tribal sovereign immunity; (2) *Pennhurst* and subsequent cases reaffirming that state-law claims cannot be brought under *Ex parte Young*; and (3) cases holding that tribal and state officials are to be treated alike for immunity purposes, *see, e.g.*, *Lewis*, 137 S. Ct. at 1291. The *Bay Mills* Court did not sneakily do something so radical.

Confirming the point, the section of the Court's opinion immediately following the paragraph cited above is an ode to precedent and *stare decisis*. 572 U.S. at 797–803. As an alternative to its statutory arguments, Michigan urged the Court to overrule its decision in *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, which held that "[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation,"

523 U.S. 751, 760 (1998). *See Bay Mills*, 572 U.S. at 797. The Court refused, explaining, at length, that it "does not overturn its precedents lightly." *Id.* at 797–803. The idea that the Court would say this, just two pages after having created a new cause of action allowing Plaintiffs to do exactly what *Kiowa* forbids (sue tribes "on contracts" allegedly made "off reservation," *Kiowa*, 523 U.S. at 760), is implausible in the extreme. Lest there be any doubt, just three years after *Bay Mills*, the Court once again reaffirmed the foundational principle that tribes and states should be treated alike—contrary to the district court's apparent view that tribes are lesser sovereigns. *See Lewis*, 137 S. Ct. at 1291.

The Supreme Court has made clear that it does not lightly or obliquely overrule its own precedent—let alone multiple precedents at once: "Given the choice between calling into question some dicta in our recent opinions and effectively overruling a century's worth of practice, we think the former option is the only prudent course." *Bowles v. Russell*, 551 U.S. 205, 209 n.2 (2007). So too here.

### C.    At Minimum, *Bay Mills* Did Not Permit Plaintiffs' Claims.

Plaintiffs' claims would fail even if this Court were to read *Bay Mills* as creating a new equitable cause of action.

- 69 -

*First*, *Bay Mills* at most suggests that a *state* may be able to sue a tribe for violations of state law. The language cited above references the possibility only of *Michigan*'s bringing a lawsuit against tribal officials. 572 U.S. at 796. It does not allow *private plaintiffs* to file such lawsuits.

That distinction matters because "[s]tates are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). As the district court itself noted, a state's lawsuit against officials of another state belongs in federal court under the original design of the Constitution, JA1768, and does not implicate the same concerns about suits brought by private parties against state officials that led to the adoption of the Eleventh Amendment. *See* U.S. Const. art. III, § 1; *id.* Am. XI. Indeed, just last Term, the Supreme Court underscored this distinction between state suits and private-party suits. *Franchise Tax Bd. of Ca. v. Hyatt*, 139 S. Ct. 1485, 1495, 1499 (2019) ("Article III [provides] a neutral federal forum in which the States agreed to be amenable to suits brought by other States," but states "retain[] immunity from private suits, both in their own courts and in other courts").

States also think differently than private plaintiffs when deciding whether to commence litigation. They consider the interests of *all* their

citizens, including those who might benefit from an allegedly controversial practice. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). Private plaintiffs, by contrast, are under no obligation to consider anyone else's interests. As sovereigns, states also weigh principles of comity in deciding how to structure relationships with other sovereigns, often deciding to adopt more productive approaches than litigation. The Tribe, for example, has engaged in a Memorandum of Understanding with the government of New Mexico to iron out in advance jurisdictional issues created by the rise of e-commerce,[25] and the Tribe continually endeavors to negotiate similar agreements with other states. JA141. Private plaintiffs need not consider comity, and the lawsuits they bring can impede productive intergovernmental relationships.

*Second*, Appellants are aware of no decision allowing private plaintiffs to sue tribal officials for conduct occurring within tribal jurisdiction. *Bay Mills* was premised on the tribe's conduct occurring on state rather than reservation land, 572 U.S. at 791, and not even the Second Circuit in *Gingras* suggested that tribal officials could be sued for on-reservation activity, *see* 922

---

[25] *See* Mem. of Understanding, Commerce In The Electronic Age (Dec. 23, 2019), https://perma.cc/N3JY-DGE4.

F.3d at 117 (court's decision relates only to "off-reservation conduct"). Indeed, *Cabazon* prohibited a *state* from suing a tribe for on-reservation conduct in light of "compelling federal and tribal interests" in tribal economic development. 480 U.S. at 219.[26]

This distinction is likewise essential because Plaintiffs are challenging their loan contracts, but agreed those contracts were "made and accepted in the sovereign territory of the Habematolel Pomo of Upper Lake." JA138. Plaintiffs have never disputed that they agreed to that contract term, nor have they ever claimed the term is ambiguous or unclear. Rightfully so—the term means what it says.

In invalidating the parties' agreement on that score, the district court misapplied basic contracting principles. The court's only support was a partial quote from the Second Restatement of Contracts allowing invalidation of

---

[26] In *Cabazon*, the Court held that tribes may enact on-reservation gaming regulations that conflict with state gaming laws applicable outside the reservation. *See* 480 U.S. at 221–22. The Court rejected California's argument that the tribe was "merely marketing an exemption from" state law, finding that the state's interests could not override the tribe's interest in "rais[ing] revenues and provid[ing] employment for [its] members." *Id.* at 219. This holding further undermines the district court's reasoning that creating a new state-law cause of action is necessary to prevent tribes from "violat[ing] state laws with impunity" through their efforts at economic development. JA1768 (quoting *Gingras*, 922 F.3d at 124).

- 72 -

contractual provisions in order to "serve[] the public interest." *See* JA1771.

But the italicized words the district court omitted are essential to the principle

it purported to invoke: "In choosing *among the reasonable meanings* of a

promise or agreement or a term thereof, a meaning that serves the public

interest is generally preferred." Restatement (Second) of Contracts § 207

(1981) (emphasis added); *compare* JA1771. Here, Plaintiffs have offered no

reasonable alternative reading of the term "[t]his Agreement is made and

accepted in the sovereign territory of the Habematolel Pomo of Upper Lake,"

JA138—nor can they. Accordingly, the district court's public policy concerns

provided no basis for overriding the plain meaning of the parties' contracts.

\*    \*    \*

In *Williams*, this Court concluded that denying sovereign immunity

"would weaken the Tribe's ability to govern itself according to its own laws,

become self-sufficient, and develop economic opportunities for its members."

929 F.3d at 185. The Court's holding aligns with decades of federal Indian

policy to the same effect. *See, e.g.*, President Reagan, American Indian Policy

Statement at 2 (Jan. 24, 1983) ("It is important to the concept of self-

government that tribes reduce their dependence on federal funds by providing

a greater percentage of the cost of their self-government."); President Nixon,

Special Message on Indian Affairs at 2 (July 8, 1970) ("Self-determination among the Indian people can and must be encouraged."); *see also* Native American Business Development, Trade Promotion, and Tourism Act, 25. U.S.C. § 4301.

The only difference between *Williams* and this case is that here, Plaintiffs are asking the Court to recognize an entirely new cause of action to indirectly accomplish the same forbidden end. Congress alone has that authority, and nothing in the U.S. Code or the Constitution sanctions that approach.

## CONCLUSION

The decision below should be reversed.

DATED: June 2, 2020                    Respectfully Submitted.

                                       /s/ Rakesh N. Kilaru
                                       Rakesh N. Kilaru
                                       James Rosenthal
                                       Kosta Stojilkovic
                                       Beth Wilkinson
                                       Matthew Skanchy
                                       Betsy Henthorne
                                       Jaclyn Delligatti
                                       WILKINSON WALSH LLP
                                       2001 M Street NW, 10th Floor
                                       Washington, D.C. 20036

Telephone: (202) 847-4000
Email: rkilaru@wilkinsonwalsh.com

*Counsel for Tribal Appellants*


/s/ Matthew E. Price
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave NW, Suite 900
Washington, D.C. 20001
Telephone: (202) 639-6873
Email: mprice@jenner.com

*Counsel for Scott Asner and*
*Joshua Landy*

## REQUEST FOR ORAL ARGUMENT

Appellants request oral argument in this appeal. Appellants respectfully submit that the Court will benefit from the opportunity to pose questions to counsel regarding the questions presented, which include significant issues of first impression in this Circuit regarding sovereign immunity and choice-of-law, and important questions concerning the enforcement of delegation and arbitration provisions under the Federal Arbitration Act.

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) in that—according to the word-count feature of the word-processing program with which it was prepared (Microsoft Word)—the motion contains 15,919 words, excluding the portions exempted by Rule 32(f).

/s/ Rakesh N. Kilaru
Rakesh N. Kilaru

## CERTIFICATE OF SERVICE

On this 2nd day of June, 2020, I electronically filed the foregoing using the Court's appellate CM/ECF system. Counsel for all parties to the case who are registered CM/ECF users will be served by that system.

/s/ Rakesh N. Kilaru
Rakesh N. Kilaru